LUCENT TECHNOLOGIES, INC., Appellant,

v.

MID–WEST ELECTRONICS, INC., et al., Plaintiff,

Air Filtration Engineering Company of Tucson, Inc., Respondent.

No. WD 58668.

Missouri Court of Appeals, Western District.

June 29, 2001.

238

Teresa A. Woody, Michael C. Leitch, Kansas City, for appellant.

Mark S. Gunnison, Robin E. Scully, II, Overland Park, for Plaintiff.

Before THOMAS H. NEWTON, P.J., JOSEPH M. ELLIS, J. and RONALD R. HOLLIGER, J.

THOMAS H. NEWTON, Judge.

## I. Factual and Procedural History

Lucent Technologies, Inc. (Lucent),[1] by and through its predecessor AT & T Corporation (AT & T) and Mid–West Electronics, Inc. (Mid–West) entered into a purchase agreement on September 13, 1995, by which Mid–West agreed to purchase Kansas City Works for $45 million. Kansas City Works was a large manufacturing facility located in Lee's Summit, Missouri. Lucent also entered into a written license agreement granting Mid–West access to a portion of the property. Lu-

---

**1.** Lucent spun off from AT & T in October 1996. Therefore, for clarity, AT & T and Lucent are the same entities for purposes of this opinion.

cent also gave Mid–West express authorization to access a portion of the facility that is now the subject to this dispute, known as the KC–1 clean room[2] for the purpose of making improvements to the area and obtaining the proper certification.

Mid–West made a down payment of $250,000 as a deposit. And if on January 5, 1996, Midwest was not satisfied with the clean room, it could terminate the purchasing agreement and receive a full refund of the entire down payment. The purchasing agreement had an initial closing date thirty days after November 13, 1995, but several extensions were granted.

In order to prepare for closing, Mid–West contacted Air Filtration Engineering Company in Tucson (AFECT) to renovate the KC–1 clean room. Lucent recommended AFECT to Mid–West because Lucent had hired AFECT to do some work in the past. AFECT recommended replacing all of the filters at a cost of approximately $700,000. Mid–West accepted AFECT's bid. The work continued until January 5, 1996, when the due diligence period expired, and Mid–West was not prepared to close on the property. Again, the parties executed an extension agreement where Mid–West agreed to continue its repairs to the facility and pay the costs out of its own funds requiring a deposit in an escrow account of $750,000. Midwest entered into an escrow agreement with Old Republic Title Company (Old Republic). As the escrow agent, Old Republic would disburse the funds after a request from Midwest and final approval by Lucent. If Mid–West purchased the property, the remaining escrow funds would be returned; but if the sale did not close, Lucent would retain the deposit and the improved clean room. The contract was silent as to who was

responsible for costs incurred above the $750,000 set aside in the escrow account.

The extension agreement also required Mid–West to supply copies of all third-party purchase orders or repair agreements executed by Mid–West, and further reserved Lucent the reasonable right to approve payments made out of the escrow account. Lucent approved all AFECT's transactions to improve and complete the required work to repair the KC–1 clean room via Mid–West. All but the four following invoices were paid (1) $72,277.18 for filters, installation, and repairs at the facility, invoice number 8665, request for payment made to Mid–West on June 14, 1996; (2) $52,250.00 for certification of the KC–1 facility as a Class 1 clean room, invoice number 8650, request for payment made to Mid–West July 23, 1996; and (3) and (4) $7,700.00 for repairs and services to the defective filters, invoice numbers 8739 dated August 2, 1996, and 8792 submitted September 6, 1996.

A new closing date was scheduled requiring Mid–West to either purchase the property or Lucent would obtain an improved clean room and all remaining funds in the escrow account. Leakage problems, however, caused a delay in the renovation process and more extensions were granted. AFECT hired Donaldson Company (Donaldson) to supply and repair the filters for the clean room, but during the course of installing the filters, leaks were discovered. Donaldson was responsible for 87.5% of the defective filters, which caused the leaks. AFECT attributed 12.5% fault to the installers that Mid–West hired. AFECT sent Mid–West invoices to cover the costs of the additional repairs totaling $61,606.70. Mid–West did not reimburse AFECT for any of the costs asso-

**2.** A clean room is a controlled environment designed for high technology manufacturing. Cleanliness is measured by the amount of airborne contaminants. A Class 1 clean room has no more than thirty particles per cubic foot of air size .1 micrometer.

ciated with the faulty filtration system. AFECT eventually reached an agreement with Donaldson, and, therefore, AFECT is only seeking damages for $7,700 of that amount to cover the 12.5% in installation costs.

After resolving the leakage problems, AFECT certified that the room was a KC–1 clean room in October 1996. A new closing date of December 13, 1996, was scheduled. Mid–West failed to close, defaulting on its agreement with Lucent. This was the final closing date, and Lucent would not agree to any more extensions. AFECT submitted the invoices for payment to Mid West prior to this final closing date, but Lucent did not reimburse AFECT out of the remaining $12,402.00 in escrow funds.

Lucent broke off all negotiations with Mid–West and obtained the KC–1 clean room. Lucent also kept the remaining funds in the escrow account. Lucent then entered a purchasing agreement with Townsend Summit, LLC (Townsend) for the sale of Kansas City Works, including the clean room. Lucent used the certified status of the KC–1 clean room as a marketing tool to draw potential buyers. Townsend purchased the facility and acquired the clean room. Lucent advised Townsend that a dispute existed as to the ownership of the new filters, but Lucent agreed to hold Townsend harmless of all claims and damages arising from that dispute. Lucent collected $28 million from this sale, and collected $12,402 from the escrow account.

AFECT's claims include damages in *quantum meruit* against Lucent for receiving the benefit of the filters and the clean room, without compensating the supplier or laborer. AFECT demanded payment on September 24, 1997, but Lucent refused to pay.

A bench trial was held on the matter, and the trial court found that AFECT was entitled to $72,277.18 for filters, installation, and repairs at the facility and $52,250.00 for certification of the KC–1 facility as a Class 1 clean room for a total of $124,527.18 in damages. Lucent brought this appeal, and AFECT filed a cross-appeal.

Lucent raises three points on appeal, two of which arise out of AFECT's *quantum meruit* claim. The first alleges that the trial court erred in rendering judgment for AFECT because an action in *quantum meruit* requires proof that Lucent accepted and retained the renovated clean room under inequitable circumstances, and no such evidence was presented. Lucent, further, argues that the evidence showed that Mid–West was not Lucent's agent, Lucent created no expectation of payment, and AFECT looked only to Mid–West for payment. Lucent also contends that AFECT, as a contractor, should not be allowed a quasi-contractual recovery because a contractor has a statutory remedy available, and AFECT failed to avail itself of a mechanic's lien. Finally, Lucent asserts that a *quantum meruit* claim requires proof that the owner received a benefit from the plaintiff, and the evidence showed that Lucent did not receive a benefit from AFECT in that the renovated clean room has never been used, and it did not add value to the property.

In its cross-appeal, AFECT argues that the trial court should have rendered judgment for AFECT in the amount of $7,700.83 because the work and activities represented by that sum were part of the overall benefit conferred upon Lucent, and Lucent was aware and appreciated the benefit. Furthermore, allowing Lucent to retain the benefit without payment would be inequitable because the work was nec-

essary to complete the certification of the KC–1 clean room as a Class 1 clean room, and this amount was not the subject of AFECT's offset against Donaldson. In AFECT's final point on the cross-appeal, it asserts that the trial court erred in not awarding prejudgment interest in favor of AFECT from September 24, 1997, because prejudgment interest is allowed for a recovery in *quantum meruit* after the amount becomes liquidated and demand is made. AFECT made a written demand to Lucent on September 24, 1997, for a total liquidated sum of $132,228.01.

## II. Standard of Review

 Appellate review of a court-tried judgment was established in *Murphy v. Carron*.[3] Pursuant to this standard, this court affirms the trial court's damages judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.[4] Under this standard, an appellate court sets aside a trial court's judgment as "against the weight of the evidence" only if it firmly believes that the judgment is wrong.[5]

## III. Legal Analysis

### A. Elements of Quantum Meruit

Lucent's first and third points on appeal focus on the elements of *quantum meruit* so we will address those points simulta-

neously. Lucent argues that AFECT failed to prove that Lucent received a benefit from AFECT and that Lucent accepted and retained the renovated clean room under inequitable circumstances. Further, Lucent argues that because Mid–West was not Lucent's agent, Lucent created no expectation of payment. Moreover, AFECT looked only to Mid–West for payment. Therefore, AFECT was not entitled to the recovery of the invoices from Lucent that the trial court awarded.

 "*Quantum meruit* is a remedy for the enforcement of a quasi-contractual obligation and is generally based on the principle of unjust enrichment."[6] The essential elements of a quasi-contract or *quantum meruit* claim are (1) benefit conferred by one party on another, (2) appreciation or recognition by the receiving party of the fact that what was conferred was a benefit, and (3) acceptance and retention of the benefit in circumstances that would render that retention inequitable.[7] When one party has been unjustly enriched at the expense of another, the beneficiary can be compelled to make restitution to the one conferring that benefit.[8]

 Lucent's third point on appeal focuses on the lack of evidence to support the trial court's finding with regards to the first element of quantum meruit, whether a benefit was conferred.[9] It contends that

---

3. 536 S.W.2d 30, 32 (Mo. banc 1976).

4. *Id.*

5. *Id.*

6. *Webcon Group, Inc. v. S.M. Properties, L.P.,* 1 S.W.3d 538, 542 (Mo.App. E.D.1999).

7. *Smith v. Smith,* 17 S.W.3d 592, 597 (Mo. App. W.D.2000).

8. *Petrie v. LeVan,* 799 S.W.2d 632, 634 (Mo. App. W.D.1990).

9. Lucent does not raise a point on appeal alleging error with regard to the second element, whether or not it appreciated or recognized the benefit of the clean room. It is clear from the record that Lucent *did* recognize the benefit of the clean room because it sold the clean room with the property. Furthermore, the trial court found that Lucent was aware of the installation and certification being done in the facility. Therefore, we find that Lucent appreciated and recognized the benefit of the newly renovated clean room.

it did not receive a benefit from the renovated clean room because it was never used and it added no value to the property. The trial court made specific findings, supported by the evidence, that AFECT conferred a benefit to Lucent by constructing and installing a new filter system in its KC–1 clean room. Through AFECT's efforts and expense, Lucent received a certified clean room, which was a valuable improvement to the Lucent facility. The fact that Lucent is not using the improvement is irrelevant.[10] AFECT improved the facility as it was directed. The clean room made the property more marketable, the improvements were necessary to complete the purchasing agreement with Mid–West, and Lucent used the certified clean room as a selling point when negotiating the sale with Townsend. Thus, the trial court's finding was supported by the evidence. Point denied.

Lucent's first point on appeal contends that the trial court lacked substantial evidence to find that it accepted and retained the benefits of the clean room under circumstances that would render the retention inequitable. In other words, Lucent claims that AFECT failed to prove the third element of unjust enrichment. Lucent relies on *Graves v. Berkowitz*[11] in support of its contention that in order to recover in *quantum meruit* against a property owner who did not contract for the work on that property, a contractor must show either that the entity that did contract for the work was acting as the agent of the owner or that the owner knowingly attempted to take undue advantage of the contractor. Lucent, further, argues that

no evidence was presented at trial indicating that Lucent and Mid–West operated within an agency relationship, that Lucent was at fault, or that Lucent was at an undue advantage.

In *Graves*, a contractor brought an action for unjust enrichment against the landowner/ landlord when the tenant, who contracted with the contractor, failed to pay.[12] The tenant leased the premises to open a restaurant, but shortly after opening, the restaurant closed and the contractor was unable to collect its debt from the tenant.[13] This court held in *Graves* that the contractor could not recover from the landlord on a claim of unjust enrichment because it was not inequitable for the landlord to retain the benefit of the improvements without paying for it.[14] *Graves* denies recovery from a landlord where he has been a passive beneficiary.[15] Furthermore, *Graves* establishes that the landlord must be at fault, or put the contractor at an undue disadvantage, or have "some agency relationship between the tenant and the landlord *something more* than passive acquiescence in the improvement to the premises"[16] in order to be liable.

This court found that the landlord was a passive beneficiary because (1) no agency relationship existed; (2) the landlord was aware of the construction, approved it, and had the right to object to the construction design, but never exercised that right; (3) the contractor never looked to the landlord for payment; (4) the contractor never made any demand on the landlord prior to filing a formal action; and (5) the contractor knew early on that the tenant was in default, yet it continued the project with-

10. *Webcon Group, Inc.,* 1 S.W.3d at 542.

11. 15 S.W.3d 59 (Mo.App. W.D.2000).

12. *Id.* at 60.

13. *Id.*

14. *Id.* at 64.

15. *Id.*

16. *Graves,* 15 S.W.3d at 64 (emphasis added).

out seeking any assurances from the landlord.[17]

The facts in the case before us share some similarities with *Graves*. AFECT knew that Lucent and Mid–West entered into a purchasing agreement, and AFECT was aware that the escrow account only contained $750,000. Furthermore, Lucent agreed to the renovation of the clean room, was very aware of it, and the contract required Lucent to approve of all invoices submitted by AFECT before Old Republic could release the funds in the filter escrow account. Like the landlord in *Graves*, Lucent had the authority to object to any of the invoices but chose not to exercise that right.

*Graves*, however, is distinguishable. AFECT demanded payment from Lucent in September 1997, prior to the filing of the formal action, and AFECT was compensated for all of its invoices until June 1996. The clean room was completed in October 1996, while Mid–West was still on the property. Between approximately September 1996 and August 1997, before submitting a final invoice to Lucent, AFECT negotiated an agreement with Donaldson concerning the faulty equipment. Upon reaching that agreement, AFECT, in August 1997, learned that Mid–West was ejected from the premises in March 1997. Within one month of receiving this information, AFECT demanded payment from Lucent for the unpaid invoices. Again, AFECT's work was completed at the time AFECT discovered that Mid–West was removed from the premises.

■ The case at hand can be decided within the scope of *Graves*. *Graves* rejects claims in *quantum meruit* unless the receiving party is "something more" than a passive beneficiary.[18] We find that Lucent affirmatively sought out AFECT's services and initiated AFECT's relationship with Mid–West.

AFECT and AT & T had established a twelve-year business relationship prior to this transaction. AT & T had contacted AFECT on several occasions to perform work at the Kansas City Works location. In fact, AFECT constructed a class 10 clean room for AT & T in 1984. Later that same year, AT & T contacted AFECT to construct two more clean rooms at this same facility. AFECT also did testing and certification on a series of smaller clean rooms at the facility in 1985. Then, around 1988, AFECT was hired to construct other special clean rooms in the facility. In 1993, AT & T contacted AFECT and requested information and the certification report regarding the clean rooms constructed in 1984 because AT & T was interested in selling the clean room or the entire facility.

More importantly, in October of 1995, just after Mid–West entered into a purchasing agreement with AT & T, AT & T contacted AFECT again to inquire about how much it would cost to recertify the rooms because AT & T was in the process of selling the facility. AFECT provided the requested information and faxed it to AT & T at AT & T's request. The quote that AFECT sent to AT & T contained a paragraph indicating that if AT & T elected to employ AFECT to test the filters in the clean room, it could complete the testing by November 15, 1995, if AT & T authorized the transaction by October 16, 1995. A representative from Mid–West then requested AFECT's clean room testing and certification references for projects AFECT completed from 1989 through 1995, and AFECT provided the

**17.** *Id.*

**18.** *Id.*

information via facsimile on November 7, 1995. AFECT was told by the representative at Mid–West to fax the references to AT & T because AT & T requested the information. On that same day, AFECT faxed Mid–West a copy of the quote for integrity leak testing and filters for the KC–1 clean room, which was previously faxed to AT & T on October 6, 1995.

AFECT's understanding at this point was that AT & T was trying to sell their Kansas City Works facility, and in order to effectuate this transaction, AT & T had to conform to existing codes. At the same time, AT & T was responsible for delivering a working clean room facility. On November 8, 1995, Mid–West submitted a purchase order from Mid–West to AFECT directing it to perform the tests. After the tests, AFECT sent its recommendations to AT & T indicating that 57% of the filters tested failed and that AFECT could either test and repair the existing filters, which would be very time consuming, or it could replace all existing filters with new ones. AT & T approved the replacement of all of the filters. The invoices were sent to Mid–West, which were forwarded to Old Republic, the escrow agent. The funds were released after Lucent's approval.

In accordance with *Graves*, this court finds that Lucent was something more than a passive beneficiary. Even though we do not find the existence of an agency relationship between Lucent and Mid–West, Lucent initiated the relationship between AFECT and Mid–West and promoted AFECT for this renovation project based on its prior dealings. Furthermore, there was substantial evidence presented for the trial court to conclude that Lucent

gave permission to Mid–West and AFECT to enter into a contract to construct the improvements and complete the necessary repairs in the KC–1 clean room. Thus, the trial court properly decided as a matter of law that Lucent received a benefit of the clean room inequitably. Point denied.

## B. Mechanic's Lien

█ Next, Lucent argues that the trial court erroneously granted judgment to AFECT because it failed to avail itself of a mechanic's lien. Lucent claims that because a mechanic's lien is a statutory remedy, which provides AFECT with an adequate legal remedy at law, AFECT's claims in equity are improper. Further, Lucent relies on *Green Quarries, Inc. v. Raasch*[19] to support its proposition. In *Green Quarries*, this court stated, in *dictum*, that it would "not allow quasi-contractual recovery where the subcontractor could have availed himself of the statutory remedy [mechanic's lien] but did not."[20]

Lucent, however, fails to outline the distinction made in *International Paper Co. v. Futhey*[21] where the appellant made a similar argument. The issue before the court in *Green Quarries* was whether or not the plaintiff's petition was properly dismissed for failure to state a claim because it failed to plead the facts essential to a recovery in *quantum meruit*.[22] Under the principles established in *Green Quarries*, the subcontractor must plead facts that allege non-payment from the property owner in order to withstand dismissal on a claim for *quantum meruit*.[23] This court held that Green Quarries' petition failed to set forth the sufficient facts

19. 676 S.W.2d 261 (Mo.App. W.D.1984).

20. *Id.* at 267.

21. 788 S.W.2d 303 (Mo.App. E.D.1990).

22. *Green Quarries, Inc.,* 676 S.W.2d at 263–64.

23. *Id.* at 266.

to constitute a *quantum meruit* claim.[24] This court, however, in *dictum*, hypothesized an outcome if the petition would have sufficiently pleaded the elements of *quantum meruit*.[25] Again, it was in *dictum* that this court stated that one who does not avail himself of the mechanic's lien remedy will be precluded from seeking recovery in *quantum meruit*.[26]

█ The issue here, as in *International Paper Co.*, is whether the trial court had authority to grant AFECT's judgment on a claim in equity even though it failed to perfect a mechanic's lien. In *International Paper*, the plaintiff failed to perfect a mechanic's lien but was awarded a judgment under *quantum meruit*.[27] The appellants appealed, alleging that the exclusive remedy for an unpaid contractor, not in privity with the property owner, is available under the mechanic's lien statute.[28] Like Lucent, the appellants in *International Paper* erroneously relied on *Green Quarries* to support its contention. The court in *International Paper* found that although "the legislature has seen fit to afford the subcontractor a measure of protection through the mechanics lien statute[,][it] does not alter the equitable principle applicable where the subcontractor fails to avail himself of the statutory remedy."[29] Moreover, a mechanic's lien is not an exclusive remedy.[30] Therefore, Lucent's argument is misplaced. Point denied.

## IV. AFECT's Cross–Appeal

AFECT raises two points in its cross-appeal. The first point alleges that the trial court erred by not awarding AFECT $7,700.83 for its work and activities associated with improving the clean room at Lucent's facility. AFECT brought this claim under *quantum meruit*.

Again, the essential elements of a quasi-contract or *quantum meruit* claim are: (1) benefit conferred by one party on another, (2) appreciation or recognition by the receiving party of the fact that what was conferred was a benefit, and (3) acceptance and retention of the benefit in circumstances that would render that retention inequitable.[31]

In order to award AFECT its recovery in the amount of $7,700.83 for repairs and replacement costs associated with the installation of the leaking filters, we must find that Lucent received a benefit from the installation. AFECT hired Donaldson to produce the filters for the clean room, and Midwest employed the subcontractor who installed these filters. The filters leaked, and AFECT had to repair and replace the leaking filters in order to certify the clean room. The total amount to repair the leaks was $61,606.00. AFECT determined that 87.5% of the problems with the leaking filters was attributable to Donaldson, and 12.5% of the problems were the result of installation activities caused by the contractors Mid–West employed. AFECT negotiated with Donaldson and did not request payment from Lucent for the 87.5% attributable to Donaldson. AFECT, however, submitted the invoice for $7,700.83 to Lucent for payment to cover the 12.5% costs attributed to the faulty installation of the filters. Lu-

24. *Id.*

25. *Id.*

26. *Id.* at 267.

27. *Int'l Paper Co.,* 788 S.W.2d at 305.

28. *Id.*

29. *Id.* at 306.

30. *See Webcon Group, Inc.,* 1 S.W.3d at 542–43.

31. *Smith,* 17 S.W.3d at 597.

cent did not participate in any of the negotiations with Donaldson or AFECT in determining the percentages of fault involved with the leaking filters.

The leaking filters were removed and are no longer within the clean room. Further, the trial court considered the damages award according to it findings of fact, which stated:

AFECT indicated that it had made a claim against the manufacturer of the filters to recoup 87.5% of the additional labor charges incurred to inspect and correct the leakage problem discovered in the installation of the new filters. The evidence does not indicate that any of the parties has made any claim against the installation contractor for any portion of the damages asserted to have been caused in the installation process.

■■■ It is apparent that the trial court concluded that Lucent did not receive the benefit of the leakage problem. The trial court's findings are supported by the record. The leaking filters were removed from the clean room and replaced with new filters that functioned properly. Lucent received the benefit of the new filters and their installation, which is represented in the $124,527.18 awarded by the trial court. Lucent is not responsible for the faulty filtration system that was removed from its facility. Lucent, however, is liable for damages associated with receiving the benefit of the new filtration system as outlined *supra*. Therefore, because Lucent has received no benefit from the leaking filters or the faulty installation, AFECT's action in *quantum meruit* to recover the costs incurred for the repairs and replacement of the leaking filters must fail.

■■■ In AFECT's second point on cross-appeal, it claims that the trial court erred in not awarding AFECT prejudgment interest from and after September 24, 1997, the date AFECT made demand on Lucent to pay $132,228.01 for the outstanding invoices. Section 408.020 [32] allows creditors to receive interest at nine percent per annum when no other rate is agreed upon on accounts that become due and demand is made. Under § 408.020, three requirements must be met before prejudgment interest can be awarded on a claim (1) the expenses must be due; (2) the claim must be liquidated or the amount of the claim must be readily ascertainable; and (3) the obligee must make a demand of the obligor for the amount due. [33]

AFECT submitted invoices for $72,277.18 for filters supplied, installed and repaired at the facility in invoice number 8665, which became due on June 14, 1996. AFECT also submitted invoice number 8650 for $52,250.00 for certification of the KC–1 clean room. It was due on July 23, 1996. The parties agree that AFECT made a demand on Lucent to pay the amounts due on September 24, 1997. Thus, the dispute on appeal is whether the damages were liquidated.

■■■ Lucent argues that because it denied liability on all the claims, the damages were unliquidated. This argument belies the very purpose of the statute. In nearly all litigation disputes, one party denies liability. Lucent's denial of liability does not relieve it of a duty to pay prejudgment interest on amounts found to be due. [34] "[E]ven when a claim is unliquidated in the sense that it has not been reduced to judgment, interest thereon will generally be allowed where the amount

**32.** RSMo 1994.

**33.** *McCormack v. Stewart Enter., Inc.,* 956 S.W.2d 310, 314 (Mo.App. W.D.1997).

**34.** *See id.*

due can be readily ascertained by computation, or by a legal or recognized standard." [35] In *Mid–West Engineering & Construction Co. v. Campagna*,[36] the Missouri Supreme Court held:

> On principle there is no reason for denying interest when the action is in quantum meruit and the claim is unliquidated in the sense that the amount due is to be measured and determined by the standard of reasonable value of the services * * * If the defendant is liable for the reasonable value of services he is under a legal duty to liquidate the sum due and interest should be allowed from the time he should have paid * * * This principle has been applied often in actions for the reasonable value of work and labor.... [37]

 Reasonable value is "the price usually and customarily paid for such services or like services at the time and in the locality where the services were rendered." [38] In order to prove the reasonable value of services, the plaintiff must present evidence or testimony that the rate charged was objectively reasonable in the marketplace.[39] "In Missouri, a plaintiff seeking payment for services under quantum meruit can testify as an expert in his own behalf as to reasonable value of those services." [40] Mr. Roy V. Zeagler, Jr., the owner of AFECT, testified without objection, that based on his knowledge, training, education, and experience in the

industry over the past twenty three years, the work performed under both invoices was reasonable.[41] Therefore, the amounts demanded in invoice numbers 8650 and 8665 totaling $124,527.18 were liquidated and ascertainable.

 Lucent further claims that AFECT is not entitled to prejudgment interest because AFECT did not recover the full amount of its demand. Although the trial court did not award AFECT $7,700.83 for invoices 8739 and 8792, AFECT is still entitled to prejudgment interest on the recovered amounts.[42] Therefore, AFECT is entitled to prejudgment interest for $124,527.18 at nine percent interest per annum. We reverse and remand this cause to the trial court with directions to grant AFECT prejudgment interest consistent with this opinion.

## V. Conclusion

We affirm the trial court's judgment awarding AFECT $124,527.18 for its *quantum meruit* claim. We reverse and remand the cause to the trial court to compute and award AFECT prejudgment interest on that amount.

JOSEPH M. ELLIS and RONALD R. HOLLIGER, JJ., concur.

35. *Id.* (citing *Komosa v. Monsanto Chemical Co.*, 317 S.W.2d 396, 400 (Mo. banc 1958)).

36. 421 S.W.2d 229 (Mo.1967).

37. *Id.* at 234 (quoting *Laughlin v. Boatmen's Nat'l Bank of St. Louis*, 354 Mo. 467, 189 S.W.2d 974, 979 (1945)).

38. *Kinetic Energy Dev. Corp. v. Trigen Energy Corp.*, 22 S.W.3d 691, 697 (Mo.App. W.D. 1999) (quoting *Baker v. Brown's Estate*, 365 Mo. 1159, 294 S.W.2d 22, 27 (1956)).

39. *Id.* at 698.

40. *Baraba v. Stuart*, 780 S.W.2d 136, 138 (Mo.App. E.D.1989).

41. *See id.* (holding that a contractor's experience in his profession qualifies him to testify as an expert to reasonable rates).

42. *See Burger v. Wood*, 446 S.W.2d 436, 444 (Mo.App.1969) (explaining that interest may be allowed when a plaintiff is not entitled to the full amount of his demand).