**Dennis D. MORAN, Respondent,**

v.

**Ronald HUBBARTT and Martha Hubbartt, Appellants.**

**No. WD 64419.**

Missouri Court of Appeals,
Western District.

Sept. 27, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 1, 2005.

Application for Transfer Denied
Dec. 20, 2005.

Seth D. Shumaker, Kirksville, MO, for appellants.

John J. Benson, Kirksville, MO, for respondent.

Before NEWTON, P.J., LOWENSTEIN and BRECKENRIDGE, JJ.

PATRICIA BRECKENRIDGE, Judge.

Ronald and Martha Hubbartt appeal the trial court's judgment, entered in accordance with the jury's verdict, in favor of Dennis Moran on Mr. Moran's quantum meruit claim for the reasonable value of excavation services that he provided to the Hubbartts and parts and labor for the repair of the Hubbartts' bulldozer. The Hubbartts raise three points on appeal. In their first two points, the Hubbartts assert the trial court erred in denying their motion for a directed verdict at the close of Mr. Moran's evidence and for a judgment notwithstanding the verdict because Mr. Moran (1) failed to present evidence that the charges for the services and parts he provided to the Hubbartts were of reasonable value; and (2) did not present evidence that he made a demand for the reasonable value of the services he provided. In their final point, the Hubbartts contend the trial court erred in not allowing them to present evidence of work they provided to Mr. Moran for which Mr. Moran did not pay. Finding no error, the trial court's judgment is affirmed.

## I. Factual and Procedural Background

Mr. Moran is a heavy equipment operator and, since at least the fall of 2000, has owned a Model 4T, 7–D Caterpillar bulldozer (4T bulldozer) with which he does excavating work. The Hubbartts own and operate an excavation business and also own several bulldozers. Sometime in the spring of 2001, Mr. Moran and Mr. Hubbartt discussed Mr. Moran buying a Model D7 17A Caterpillar bulldozer (17A bulldozer) from the Hubbartts. No deal was struck at this time, however.

On July 12, 2001, Mr. Moran agreed to help Mr. Hubbartt with a project on Don Falkiner's property. Specifically, Mr. Moran agreed to run the Hubbartts' 17A bulldozer. When Mr. Moran and Mr. Hubbartt were discussing the project, Mr. Moran told Mr. Hubbartt his hourly rate. Mr. Hubbartt never indicated whether he agreed to pay Mr. Moran an hourly rate but, instead, told Mr. Moran "he didn't want an employee, we could do some trading, or something." While no deal was actually struck, Mr. Moran proceeded to work for Mr. Hubbartt, using the Hubbartts' 17A bulldozer, on the Falkiner job for about 16.5 hours. Thereafter, the Hubbartts also requested that Mr. Moran perform work for some of their other customers. For example, from approximately July 17, 2001, to July 25, 2001, Mr. Moran operated the Hubbartts' 17A bulldozer for sixty-one hours on a project on Eugene Yearn's property. On August 1 and 2, 2001, Mr. Moran worked an additional 9.25 hours operating the Hubbartts' 17A bulldozer on Mr. Faulkiner's property. The Hubbartts billed Mr. Falkiner and Mr.

Yearn for the hours Mr. Moran worked, at the rate of $65 per hour. Although they collected the amount billed, they never paid Mr. Moran any money for these jobs.

On August 3, 2001, while Mr. Moran was working on his own project of cleaning out a pond for Bob Hamilton, his 4T bulldozer got stuck. Mr. Moran called Mr. Hubbartt for help. Mr. Hubbartt brought his 17A bulldozer to the project worksite and used it to pull Mr. Moran's bulldozer out. Mr. Hubbartt left his 17A bulldozer at the worksite for Mr. Moran to use to finish the project.

Shortly thereafter, Mr. Hubbartt got one of his own bulldozers stuck on a project on Stan Harris's property. This time, Mr. Hubbartt asked Mr. Moran for help. Mr. Moran agreed, and he and Mr. Hubbartt hauled the Hubbartts' 17A bulldozer to Mr. Harris's property and pulled the Hubbartts' bulldozer out. At some later point in time, the Hubbartts brought their 17A bulldozer to Mr. Moran's property for Mr. Moran to use to dig his own pond. After the Hubbartts delivered the 17A bulldozer to Mr. Moran's house, Mr. Moran changed the 17A bulldozer's oil and "everything on it." On August 12, 2001, Mr. Moran started building his pond using the Hubbartts' 17A bulldozer. On September 5, 2001, while Mr. Moran was using the 17A bulldozer to dig his pond, the bulldozer's hydraulic system, which controls the lifting and lowering of the front blade, went out. After the hydraulics went out, Mr. Hubbartt stopped by Mr. Moran's house to inspect the bulldozer. While they were inspecting it, Mr. Hubbartt told Mr. Moran that he would "take $6,500.00 for [the 17A bulldozer]." In re-

sponse, Mr. Moran said that he would "buy it for 6,500" and would pay Mr. Hubbartt when he "got the money from [his] pond." [1] During their discussions, Mr. Moran also told Mr. Hubbartt that he planned to convert the bulldozer's hydraulic system to cable.

Before Mr. Moran converted the bulldozer's hydraulic system, Mr. Moran worked on two other projects for the Hubbartts. In particular, from September 25 through 28, 2001, Mr. Moran operated his 4T bulldozer for 24.25 hours and performed another 3.5 hours of survey work for the Hubbartts on Max Snowbarger's property. From September 28 through October 3, 2001, Mr. Moran operated his 4T bulldozer for 33.75 hours, operated one of Mr. Hubbartt's bulldozers for 1.5 hours, and moved equipment for three hours for the Hubbartts on James Schafer's property. Mr. Moran charges $55 an hour for operating his 4T bulldozer and $12.50 an hour doing survey work or moving equipment. The Hubbartts billed Mr. Snowbarger and Mr. Schafer for Mr. Moran's time at those rates and were paid in full, but they never paid Mr. Moran for any of these projects.

About two months after the 17A bulldozer broke down, Mr. Moran completed the conversion of the bulldozer's hydraulic system to cable. Mr. Moran testified that he used parts from his shop to make the conversion, which he valued at $4,047.50. He estimated that he spent 43.5 hours making the conversion, which he valued at $12.50 an hour for a total of $543.75 for labor.[2] Thus, the total value of the conversion according to Mr. Moran was $4,591.25.

---

1. According to Mr. Moran, on a "government pond," which Mr. Moran was digging on his property, after the pond is dug, fenced, and the bills are turned in, the government issues the landowner a check.

2. Mr. Moran valued his labor for the conversion at $12.50 an hour because he performed the work "outside" his shop. For work Mr. Moran performed "inside" his shop, he charged $25 an hour.

After making the conversion to cable, Mr. Moran continued to use the 17A bulldozer to finish building his pond, which he eventually completed in December 2001. Mr. Moran never paid any money to the Hubbartts for purchase of the 17A bulldozer. Likewise, the Hubbartts never paid Mr. Moran any money for parts or labor for the conversion of the 17A bulldozer's hydraulic system.

Following the conversion, Mr. Hubbartt asked Mr. Moran what he would charge to operate the 17A bulldozer. Mr. Moran told Mr. Hubbartt that he charged $65 an hour for his services on the 17A bulldozer. Thereafter, Mr. Moran continued to work on additional jobs for the Hubbartts, for which the Hubbartts never paid Mr. Moran. For example, from November 21 through 24, 2001, Mr. Moran operated the 17A bulldozer for twenty-four hours on Marvin Gregory's property. From December 7 through 17, 2001, Mr. Moran operated the 17A bulldozer for the Hubbartts for approximately 41.5 hours on Charles Newcomb's property. Finally, from January 5 through 12, 2002, Mr. Moran operated the 17A bulldozer an additional thirty-one hours on Mr. Gregory's property. For each of these projects, the Hubbartts billed their customers and were paid $65 an hour. The Hubbartts, however, never paid Mr. Moran for any of these projects.

Throughout the spring and summer of 2002, Mr. Moran retained possession of the 17A bulldozer and performed additional work on it. Mr. Moran testified that he used approximately $2625 worth of used parts from his shop, spent $5,283.86 on new parts, and worked 230 hours on the 17A bulldozer, which he valued at $25 an hour. Including the value of his time, Mr. Moran testified that he spent a total of $13,658.86 during this time making repairs on the 17A bulldozer.[3]

On one night between December 3 and 7, 2002, the Hubbartts went to a job site in Adair County where Mr. Moran was using the 17A bulldozer and took repossession of the bulldozer. On December 11, 2002, by way of letter from his attorney, Mr. Moran demanded the return of the 17A bulldozer. The letter stated that the Hubbartts sold the bulldozer to Mr. Moran for $6500 and they had "actually been paid sums greater than the agreed purchase price, by receiving from customers' [sic] money which was earned by Mr. Moran for excavation work performed, and by converting said money to [their] own use." The letter also indicated that Mr. Moran had made significant improvements to the bulldozer worth approximately $9000 and "expended hundreds of hours of his own labor in making" the repairs and improvements to the bulldozer. The Hubbartts responded to Mr. Moran's letter with a letter from their attorney dated December 18, 2002. In this letter, the Hubbartts asked for documentation to support Mr. Moran's claim that he "purchased or is purchasing the dozer."

On January 22, 2003, Mr. Moran filed a four-count petition against the Hubbartts. In Count I, Mr. Moran sought compensatory and punitive damages for conversion. Count II sought return of the bulldozer based on replevin. Count III sought compensatory damages for breach of contract. Count IV sought "compensatory damages" in quantum meruit. On February 14, 2003, the Hubbartts filed a general denial and asserted no affirmative defenses.

A jury trial was held on Mr. Moran's claims on April 20–21, 2004. During trial, Mr. Moran orally dismissed Counts I and III. At the close of Mr. Moran's case, the

---

**3.** The total amount Mr. Moran testified he spent on conversion of the 17A bulldozer and the 2002 spring and summer repairs was $18,250.11.

Hubbartts moved for a directed verdict on the remaining counts. The trial court granted the Hubbartts' motion as to Count II (replevin) and overruled the motion as to Count IV (quantum meruit). On the quantum meruit claim, the jury returned a verdict in favor of Mr. Moran and awarded him a judgment against the Hubbartts for $10,000 for the reasonable value of the parts and labor Mr. Moran supplied to the 17A bulldozer and $10,535 for the reasonable value of the excavation services Mr. Moran furnished to the Hubbartts. On April 27, 2004, the trial court entered judgment in accordance with the jury's verdict. Thereafter, the Hubbartts filed a motion for judgment notwithstanding the verdict. Following a hearing, the trial court overruled the motion. The Hubbartts filed this appeal.

## II. Standard of Review

In their first two points, the Hubbartts assert the trial court erred in overruling their motions for a directed verdict and judgment notwithstanding the verdict on Mr. Moran's quantum meruit claim. This court reviews the denial of a motion for a directed verdict and a motion for judgment notwithstanding the verdict under essentially the same standard. *Altenhofen v. Fabricor, Inc.*, 81 S.W.3d 578, 584 (Mo. App.2002). A judgment notwithstanding the verdict "for the defendant is only appropriate if the plaintiff fails to make a submissible case." *Id.* "In reviewing for a submissible case, this court must accept all evidence and reasonable inferences favorable to the verdict, disregarding contrary evidence." *Id.* This court will not supply missing evidence nor give the plaintiff "the benefit of unreasonable, speculative, or forced inferences." *Id.*

"A motion for [judgment notwithstanding the verdict] should be granted only when reasonable minds cannot differ as to the ultimate disposition of the case." *Id.* This court will reverse a jury verdict "for insufficient evidence only where there is a 'complete absence of probative fact' to support the jury's conclusion." *Id.* (citation omitted). "The jury is the sole judge of the credibility of the witnesses and the weight and value of their testimony and may believe or disbelieve any portion of that testimony." *Id.*

## III. Evidence of Reasonable Value of Services Sufficient

In their first point on appeal, the Hubbartts assert the trial court erred in overruling their motion for a directed verdict at the close of Mr. Moran's evidence and overruling their motion for a judgment notwithstanding the verdict because Mr. Moran failed to prove the reasonable value of his services. In particular, the Hubbartts claim that Mr. Moran failed to demonstrate that the services Mr. Moran provided for their benefit "were of reasonable value at the time they were rendered at the price usually and customarily paid for such services in the locale in which they were performed."

 To prevail on a claim for quantum meruit, Mr. Moran was required to show: (1) that he provided the Hubbartts services at the Hubbartts' request or with their acquiescence; (2) the services [provided] were of a certain and reasonable value; and (3) the Hubbartts "refused to pay for such services after demand" by Mr. Moran. *Mills Realty, Inc. v. Wolff*, 910 S.W.2d 320, 322 (Mo.App.1995).[4] "Recovery in quantum meruit for services per-

---

4. With the exception of challenging that Mr. Moran failed to make a demand for the value of his services, which is discussed in point two, *infra*, the Hubbartts conceded that Mr. Moran established the other elements for recovery under quantum meruit.

formed is limited to the reasonable value of the services." *Richard B. Curnow, M.D., Inc. v. Sloan*, 625 S.W.2d 605, 607 (Mo. banc 1981). "Failure to prove reasonable value is fatal to a quantum meruit claim." *Hoops v. Gateway Food Prods.*, 824 S.W.2d 451, 453 (Mo.App.1991).

The reasonable value of services is " 'the price usually and customarily paid for such services or like services at the time and in the locality where the services were rendered.' " *Lucent Techs., Inc. v. Mid–West Elecs., Inc.*, 49 S.W.3d 236, 247 (Mo.App.2001) (citation omitted). To prove the reasonable value of the services he provided to the Hubbartts, Mr. Moran was required to demonstrate "that the rate charged was objectively reasonable in the marketplace." *Id.* " 'In Missouri, a plaintiff seeking payment for services under quantum meruit can testify as an expert in his own behalf as to reasonable value of those services.' " *Id.* (citation omitted).

Here, the jury awarded Mr. Moran $10,535 for the reasonable value of the excavation services he furnished to the Hubbartts and $10,000 for the reasonable value of the parts and labor in repairs he made to the Hubbartts' 17A bulldozer. The Hubbartts claim that the trial court erred in failing to sustain their motion for a directed verdict and judgment notwithstanding the verdict because Mr. Moran failed to establish that these values were reasonable.

The Hubbartts correctly note that Mr. Moran never testified that the value of the excavation services he provided to the Hubbartts or the parts and labor associated with the repair of the 17A bulldozer were "reasonable." Nevertheless, a requirement that the term "reasonable" must be specifically stated is overly restrictive. For example, in *Hoops*, this court identified "other terms that would fulfill that requirement." 824 S.W.2d at

453. In particular, in *Hoops*, this court held that, when a plaintiff establishes that he is an expert, "evidence as to services performed, what was charged and what they were worth [is] sufficient to fulfill [the] plaintiff's burden on the reasonableness issue." *Id. See also Curnow*, 625 S.W.2d at 607 ("The plaintiff's own testimony, considering his first hand knowledge of this case as well as his professional opinion, establishes the reasonableness of the fee in question.").

Thus, regarding both the jury's award of damages for the value of excavation services and the jury's award of damages for the value of parts and labor associated with repair of the bulldozer, this court must determine whether the trial court could have found sufficient evidence of (1) Mr. Moran's qualifications as an expert; (2) the services Mr. Moran performed for the Hubbartts; (3) the price Mr. Moran charged for those services; and (4) the worth of those services. This court will consider the evidence regarding the reasonable value of the excavation services separately from the value of the parts and labor associated with repair of the bulldozer.

### a. Excavation Services

Under *Hoops*, the first requirement that must be satisfied is whether Mr. Moran presented sufficient evidence to satisfy his burden on the question of the reasonableness of the value of excavation services is that Mr. Moran qualified as an expert on the value of excavation services. 824 S.W.2d at 453. Regarding this element, the evidence demonstrated that Mr. Moran has worked in the excavation business and operated heavy equipment for fifteen years. He further testified that he has worked with bulldozers since he was about fifteen years old. In Missouri, "[a] contractor's experience in his profession

qualifies him to testify as an expert to reasonable rates." *Baraba v. Stuart,* 780 S.W.2d 136, 138 (Mo.App.1989). Consequently, this court finds that the record contained sufficient evidence from which the trial court could have found that Mr. Moran qualified as an expert regarding excavation services.

The second requirement under *Hoops* to fulfill the reasonableness requirement is that evidence must have been presented regarding the excavation services Mr. Moran performed for the Hubbartts. 824 S.W.2d at 453. On this element, Mr. Moran's testimony detailed each of the excavation services he performed for the Hubbartts beginning in July 2001 and ending in January 2002, the range of dates covered by the jury's award. Specifically, Mr. Moran testified as to whose property the work was performed on, the number of hours he worked, and which bulldozer he operated on the particular job. He further testified to the number of hours he spent doing other types of work for the Hubbartts, such as repair work, survey work, or moving equipment.

Moreover, Mr. Hubbartt also testified concerning the actual excavation services Mr. Moran provided to the Hubbartts. Mr. Hubbartt's testimony was consistent with Mr. Moran's testimony. In particular, Mr. Hubbartt's testimony concerning the excavation services Mr. Moran provided to the Hubbartts was based on the Hubbartts' answers to Mr. Moran's interrogatories, which detailed the same excavation services provided by Mr. Moran as testified to by Mr. Moran. For example, Mr. Hubbartt testified as to the location of the property where Mr. Moran provided excavation services, the dates Mr. Moran provided such services, and the number of hours Mr. Moran worked on each project. Therefore, this court finds that the record contained sufficient evidence regarding the actual excavation services Mr. Moran performed for the Hubbartts.

The third requirement under *Hoops* to fulfill the reasonableness requirement is that evidence must have been presented regarding the price Mr. Moran charged for excavation services. 824 S.W.2d at 453. Regarding this element, Mr. Moran specifically testified as to the rate he charged for the excavation services he performed for the Hubbartts. In particular, he testified that he charged $65 an hour for operating the 17A bulldozer and $55 an hour for operating his 4T bulldozer. In fact, these rates were the same rates Mr. Hubbartt testified he charged his customers for Mr. Moran's excavation services. Specifically, in response to Mr. Moran's interrogatories, the Hubbartts admitted that they charged their customers $65 an hour for work done by Mr. Moran with the 17A bulldozer and $55 an hour for work done by Mr. Moran using Mr. Moran's 4T bulldozer. Thus, this court finds that the record contained sufficient evidence regarding the rate Mr. Moran charged for excavation services.

The fourth requirement under *Hoops* to fulfill the reasonableness requirement is that evidence must have been presented regarding the worth of Mr. Moran's excavation services. 824 S.W.2d at 453. In this case, the evidence demonstrated that before Mr. Moran undertook any excavation work for the Hubbartts, Mr. Moran and Mr. Hubbartt had a discussion about what Mr. Moran charged for operating a bulldozer. Specifically, Mr. Moran told Mr. Hubbartt that he charged $55 an hour for operating his 4T bulldozer and $65 an hour for operating the 17A bulldozer. Mr. Moran also testified that these rates were "industry standards" and that no one had ever questioned those rates. Moreover, Mr. Hubbartt, who owns an excavation business, also testified that the "going

rate" for a man operating a 17A bulldozer was $65 an hour. And even though Mr. Moran and Mr. Hubbartt never entered into a formal agreement regarding Mr. Moran's fee for excavation services, the Hubbartts never questioned the rate quoted by Mr. Moran and the Hubbartts continued to request that Mr. Moran work for them after they were aware of the rates he charged for such services.

In addition, the jury awarded Mr. Moran damages in the amount of $10,535 for the value of the excavation services he provided to the Hubbartts. This amount was the exact amount at which Mr. Moran agreed to perform the excavation services for the Hubbartts, according to the Hubbartts' response to Mr. Moran's interrogatories. Specifically, in their response to Mr. Moran's interrogatories, the Hubbartts admitted that Mr. Moran performed 182 hours of excavation services on their behalf for six different customers. They also admitted that they charged their customers, and were paid, $10,535 for such services. The Hubbartts' conduct in accepting the charges made by Mr. Moran for his excavation services, billing their customers in that amount, and receiving payment from their customers in that amount, is sufficient evidence from which a jury could reasonably infer that $10,535 was a the reasonable value of the excavation services Mr. Moran performed for the Hubbartts.

In sum, even though Mr. Moran never actually testified that the charges for the excavation services he provided to the Hubbartts were "reasonable," he did present evidence that fulfills the requirement of demonstrating that the value of his excavation services was reasonable. *Hoops,* 824 S.W.2d at 453. Thus, Mr. Moran presented a submissible case for quantum meruit regarding the excavation services he performed for the Hubbartts. According-

ly, the trial court did not err in denying the Hubbartts' motions for a directed verdict and for a judgment notwithstanding the verdict with respect to the excavation services Mr. Moran performed for the Hubbartts.

### b. Value of Parts and Labor Associated with Repair of the 17A Bulldozer

■ Under *Hoops,* the first requirement that must be satisfied to determine whether Mr. Moran presented sufficient evidence to satisfy his burden on the question of the reasonableness of the value of parts and labor associated with repair of the 17A bulldozer is that Mr. Moran qualified as an expert regarding bulldozer parts, and labor costs associated with repair of bulldozers. 824 S.W.2d at 453. As discussed above, the evidence demonstrated that Mr. Moran has worked in the excavation business for fifteen years and has worked with bulldozers since he was about fifteen years old. In addition, Mr. Moran testified that he owns a 4T Caterpillar bulldozer, has purchased other bulldozers for salvage, and has become familiar with the value of bulldozer parts, both new and used, over the last three to five years because he buys them all the time. Thus, this court finds that the record contained sufficient evidence, which was unchallenged by the Hubbartts, from which the trial court could have found that Mr. Moran qualified as an expert regarding the value of bulldozer parts and labor associated with repair of the 17A bulldozer. *Baraba,* 780 S.W.2d at 138.

The second requirement under *Hoops* to fulfill the reasonableness requirement is that evidence must have been presented regarding the services Mr. Moran performed for the Hubbartts related to repair of the bulldozer. 824 S.W.2d at 453. Mr. Moran testified in detail as to the work he

performed on the 17A bulldozer. For example, Mr. Moran testified that after the Hubbartts delivered the 17A bulldozer to his house, he changed the bulldozer's oil and "everything on it." He also testified regarding the details of changing the bulldozer's hydraulic lift system. Mr. Moran further testified that Mr. Hubbartt assisted Mr. Moran with some of the work performed on the bulldozer. In addition, Mr. Moran testified in detail as to the new and used parts he supplied to the 17A bulldozer. He also submitted exhibits itemizing the new and used parts he utilized on the 17A bulldozer. Consequently, this court finds that the record contained sufficient evidence regarding the actual services Mr. Moran performed on the 17A bulldozer.

The third requirement under *Hoops* to fulfill the reasonableness requirement is that evidence must have been presented regarding the price Mr. Moran charged for parts and labor associated with repair of the 17A bulldozer. 824 S.W.2d at 453. On this element, Mr. Moran testified as to what he charged for the various new and used parts he supplied to the 17A bulldozer. Regarding the used parts, Mr. Moran testified that he obtained these parts from other bulldozers that he owns and detailed the prices charged for each item. Regarding new parts, Mr. Moran submitted copies of receipts from various machine shops indicating the price Mr. Moran paid to obtain the items. In addition, as discussed above, Mr. Moran testified as to the price he charged for labor for doing repair work to a bulldozer. Specifically, he testified that he charged $12.50 an hour for doing repair work to a bulldozer outside his shop and $25 an hour for repairing a bulldozer inside his shop. Mr. Moran attributed the higher cost associated with making repairs inside his shop to such things as the extra cost of lights, water, wear and tear of tools, and the overall expense of running a shop. Given Mr. Moran's testimony regarding the prices of parts and labor associated with repair of the 17A bulldozer, this court finds that the record contained sufficient evidence regarding the price Mr. Moran charged for parts and labor.

The final requirement under *Hoops* to fulfill the reasonableness requirement is that evidence must have been presented regarding the worth of the parts and labor Mr. Moran provided to the Hubbartts associated with repair of the 17A bulldozer. 824 S.W.2d at 453. Mr. Moran testified in detail about the total value of the parts and labor he supplied to the 17A bulldozer, which totaled $18,250.11. As discussed above, Mr. Moran testified that he used parts taken from other bulldozers he owned and that the price included in his summary of costs was what he believed their "value" to be. *See Farley v. Farley,* 51 S.W.3d 159, 164 (Mo.App.2001) (general rule is that property owner is competent to testify regarding property's value). Regarding new parts, Mr. Moran admitted, without objection, receipts, which detailed what he paid for the parts. Regarding the price Mr. Moran charged for labor, Mr. Moran testified that his rates were "industry standards." In light of the evidence presented by Mr. Moran, this court finds that the jury's award of $10,000 in parts and labor associated with Mr. Moran's repair of the 17A bulldozer was clearly within the range of the evidence.

In sum, even though Mr. Moran did not actually testify that the value of the parts and labor he supplied to the Hubbartts in making repairs to the 17A bulldozer was reasonable, he did present evidence that fulfills that requirement. *Hoops,* 824 S.W.2d at 453. Thus, Mr. Moran presented a submissible case for quantum meruit regarding the parts and labor he supplied to the Hubbartts. Consequently, the trial court did not err in denying the Hubbartts'

motions for a directed verdict and for a judgment notwithstanding the verdict with respect to the parts and labor provided by Mr. Moran to the Hubbartts for repair of the 17A bulldozer. Point denied.

### IV. No Challenge to Failure to Make Demand Permitted

In their second point, the Hubbartts assert the trial court erred in denying their motion for a directed verdict at the close of Mr. Moran's evidence and for a judgment notwithstanding the verdict because Mr. Moran failed to present evidence that he made a demand for the money the Hubbartts allegedly owed him. In particular, the Hubbartts contend that to prevail in an action brought under quantum meruit, Mr. Moran was required to plead and prove, not only that they failed to pay the money allegedly owed Mr. Moran, but also that Mr. Moran made a prior demand for the amount owed.

Under Rule 55.31:

A party cannot object that no demand for the subject matter of a civil action was made prior to its institution unless it is expressly set up by way of defense in the answer or reply and is also accompanied with a tender of the amount or thing that is due[.]

*See also* Section 509.410, RSMo 2000.[5] This rule "was meant to prevent actions from being defeated because no prior demand was made for the subject-matter of them, when such a demand was a condition precedent to the right to sue at common law." *Downs v. Pac. Express Co.,* 135 Mo.App. 330, 116 S.W. 9, 11 (1909) (dis-

cussing section 1575, RSMo 1899, the predecessor statute to section 509.410). Thus, the Hubbartts cannot now claim that Mr. Moran failed to make a prior demand for the amount allegedly owed unless they expressly set up such a defense in their answer and tendered the amount allegedly owed. *See Boyd v. Lane,* 869 S.W.2d 305, 309 (Mo.App.1994); *Adzick v. Chulick,* 512 S.W.2d 194, 198 (Mo.App.1974).

Here, the Hubbartts merely filed a general denial to Mr. Moran's claim. They also made no tender of the amount allegedly due as required by Rule 55.31. Consequently, the Hubbartts cannot now object that Mr. Moran made no prior demand for the amounts allegedly owed. Point denied.

### V. Evidence of Unpaid Services Inadmissible in Absence of Pleading Affirmative Defense or Counter–Claim of Set–Off

In their third point, the Hubbartts assert the trial court erred in not allowing them to present evidence of work they provided to Mr. Moran for which they were not paid. They contend they did not seek to introduce such evidence as the affirmative defense of set-off. Rather, they claim such evidence "tends to negate the lawfulness of [Mr.] Moran's claim against them." In addition, they assert that they "did not confess [Mr.] Moran's actions for quantum meruit," their "proof" is not independent of Mr. Moran's actions, and the evidence they sought to introduce would have demonstrated the "expecta-

---

5. Section 509.410 provides:

It shall not hereafter be available to a party as an objection that no demand for the subject matter of a suit was made prior to its institution, unless it is expressly set up by way of defense in the answer or replication, and is also accompanied with a tender of the amount that is due; in which case, if the plaintiff will further prosecute his suit, and shall not recover a greater sum than is tendered, he shall pay all costs. This provision shall be applicable as well to actions for property as for money; when property is tendered the damages for its detention, if any, shall also be tendered.

tions of the parties involved and rebut[ted][Mr.] Moran's testimony."

 "A quantum meruit claim is based on a promise implied by the law that a person will pay reasonable compensation for valuable services or materials provided at his request or with his approval." *Kujawa v. Billboard Cafe at Lucas Plaza, Inc.,* 10 S.W.3d 584, 588 (Mo.App.2000). "This type of implied contract is in fact a noncontractual obligation that is treated procedurally as if it was a contract, but that has as its principal function the prevention of unjust enrichment." *Id.* "In cases of quantum meruit recovery, the defendant, viewed as breaching the implied contract, is required to return to the injured party the reasonable value of work and labor furnished." *Id.* "The law will imply a promise to pay reasonable value if [the] plaintiff supports the claim with evidence the services were requested and actually received with an *expectation of compensation.*" *Id.* (emphasis added). *See also Hildebrand v. Ballard,* 767 S.W.2d 62, 66 (Mo.App.1989) ("The right to recover in quantum meruit arises when services are provided and accepted under circumstances that would justify an expectation of payment of the reasonable value of those services to the person providing them.").

 Here, the Hubbartts argue that the evidence they sought to introduce would negate any intent on the part of Mr. Moran to charge them for the value of the services he sought to recover from them in his quantum meruit claim. Thus, they conclude that such evidence would have negated an essential element of Mr. Moran's cause of action in quantum meruit, i.e., expectation of payment, and, therefore, the evidence was admissible under a general denial.

 The Hubbartts correctly argue that, " 'any evidence which will show that the plaintiff's cause never had a legal existence is admissible under a general denial even though the facts are affirmative insofar as they negate the plaintiff's cause of action and are not by way of confession and avoidance.' " *Farm Bureau Town & Country Ins. of Mo. v. Hilderbrand,* 926 S.W.2d 944, 948 (Mo.App.1996) (citation omitted). *See also Miller v. Archdekin,* 497 S.W.2d 178, 180 (Mo.1973) (evidence that would show plaintiff's claimed cause of action never existed properly admissible under general denial). Nevertheless, the evidence the Hubbartts sought to introduce would not have demonstrated that Mr. Moran did not expect to receive payment for the services he rendered to the Hubbartts. The Hubbartts incorrectly conclude that "expectation of payment" is limited to an expectation of a monetary payment. Such a narrow interpretation of an expectation of payment is incorrect, however. An "expectation of payment" does not merely encompass an expectation of a "monetary payment" but, rather, means that the goods or services were not provided "gratuitously." In other words, the relevant issue is whether, in providing services to the Hubbartts, did Mr. Moran consider the Hubbartts obligated to him in some way. If he did, then the services were not rendered gratuitously. *See Poppa v. Poppa,* 364 S.W.2d 52, 55 (Mo.App. 1962).

The circumstances of this case are similar to the facts in *Poppa.* In that case, Carl Poppa filed a claim against the estate of Herbert Poppa, his deceased brother, for services rendered "in picking and shelling 180 acres of corn." *Poppa,* 364 S.W.2d at 53. In particular, Carl testified that for many years before his brother's death, he and his brother "had a custom whereby they exchanged farm work and implements; that they kept no records of such

exchanges; that, at any time [Carl] needed [Herbert's] services, [Carl] knew that they would be available even without asking." *Id.* at 54. At some time before Herbert's death, Herbert had asked Carl to pick and shell about 180 acres of corn. *Id.* Carl obliged and used his own equipment and two barrels of gasoline to complete the job. *Id.* Because of the brothers' prior custom of trading work, Carl never considered Herbert obligated to him and did not expect to bill his brother in "dollars and cents." *Id.* In other words, Carl expected Herbert "to work for him at some future time when his services might be needed." *Id.* Herbert died, however, before he provided any services to Carl in return. *Id.* Carl then filed a claim against Herbert's estate for the "customary" and "going" charge for the services he provided to Herbert. *Id.* The trial court awarded Carl $1350 on his claim. *Id.* at 53.

On appeal, Herbert's estate argued that the "judgment [could not] stand because the evidence clearly demonstrated that [Carl] had no intention to make a charge against [Herbert] therefor at the time the services were rendered." *Id.* at 54. This court disagreed, however, because the evidence demonstrated that the brothers "were just more or less trading work" and Carl "intended to make a charge either in money or services." *Id.* at 55. In other words, the evidence demonstrated that Carl understood that if Herbert had lived, "he would pay him back whatever he was ahead." *Id.* Thus, this court rejected the estate's argument that Carl had no "expectation of payment" and upheld the trial court's award. *Id.*

Similarly, in the case at bar, the evidence the Hubbartts sought to introduce would not have demonstrated that Mr. Moran provided services to the Hub-

bartts gratuitously but, rather, would have demonstrated that they were trading services with Mr. Moran. Simply because Mr. Moran did not bill the Hubbartts in "dollars and cents" does not mean that he did not have an expectation of payment for the services he provided. Rather, as the brothers in *Poppa*, the evidence the Hubbartts sought to introduce, i.e., that the Hubbartts provided services to Mr. Moran that Mr. Moran did not pay for, would have merely demonstrated that they were trading services. In other words, the Hubbartts and Mr. Moran did not expect to pay each other in money but, rather, expected to pay each other in services. Consequently, the evidence the Hubbartts sought to introduce would not have "negated any inference of an expectation of payment, a necessary element for [Mr. Moran's] recovery in quantum meruit." *Hildebrand*, 767 S.W.2d at 66. Rather, the evidence the Hubbartts sought to introduce would have served merely to demonstrate a set-off. "Set-off has traditionally been considered an independent action that must be pleaded as a counterclaim," or as an affirmative defense. *Brizendine v. Conrad*, 71 S.W.3d 587, 592–93 (Mo. banc 2002). Because the Hubbartts failed to raise set-off as either a counterclaim or as an affirmative defense, the trial court did not err in denying the Hubbartts the opportunity to present evidence of the work the Hubbartts provided to Mr. Moran that Mr. Moran did not pay for.[6] Point denied.

The judgment of the trial court is affirmed.

All concur.

---

**6.** The Hubbartts orally moved on the morning of trial for leave of court to plead the affirma-

tive defense of set-off. The trial court denied their request.