**James KUJAWA d/b/a Restaurant Builders, Appellant,**

v.

**BILLBOARD CAFÉ AT LUCAS PLAZA, INC., et al., Respondents.**

**No. ED 75984.**

Missouri Court of Appeals, Eastern District, Division Four.

Jan. 25, 2000.

Allen P. Press, Clayton, for appellant.

Thomas P. Hohenstein, St. Louis, for respondent.

KENT E. KAROHL, Judge.

Plaintiff-appellant James Kujawa, d/b/a Restaurant Builders, appeals summary judgment against him and in favor of de-

fendants Billboard Café at Lucas Plaza Inc., et. al., on his quantum meruit claim concerning construction work he performed at Lucas Plaza. Appellant argues the trial court erred in granting defendant's motions for summary judgment because a genuine issue of material fact existed. We affirm.

James Kujawa (Kujawa) was the sole proprietor of a general contracting business, d/b/a Restaurant Builders. Lucas Plaza Associates (LPA), a Missouri general partnership, purchased the Lucas Plaza Building at 614 North Eleventh Street in St. Louis, Missouri in 1985 with a loan from Mark Twain St. Louis Bank, N.A. (Mark Twain), now known as Mercantile Bank, N.A. The bank loan is secured by a first deed of trust. Tarquad Corporation (Tarquad) was the trustee under the deed of trust. Cooperative Management Company (CMC), a Missouri corporation, managed the Lucas Plaza commercial property for LPA. LPA maintained a business relationship with Paric Corporation (Paric), a Missouri corporation engaged as a general contractor in the construction business. Paric, CMC and LPA all had common ownership and officers. Billboard Café, Inc., a Missouri corporation, was formed to manage Billboard Café, a restaurant located at the Lucas Plaza building. Tridon Corporation, also called Tridon Development Corporation, a Colorado corporation lawfully doing business in Missouri, contracted to lease office space at the Lucas Plaza building. Kujawa sued each of these entities and others.[1]

In 1988, Paul Ebeling (Ebeling) contacted LPA representatives regarding a potential lease of the first floor space at Lucas Plaza. Ebeling intended to use the first floor for a restaurant, Billboard Café. The space required construction work before tenant occupancy could occur. Ebeling

eventually formed Billboard Café, Inc. for the purpose of operating the restaurant. Ebeling was a shareholder, officer, and director of Billboard Café, Inc. During the lease negotiations between Ebeling and LPA, Ebeling selected Kujawa as the contractor to remodel the first floor as the restaurant space for Billboard Café. LPA usually retained Paric to do improvement work on its real estate. Nevertheless, LPA agreed to allow Ebeling to use Kujawa as his contractor.

On January 16, 1989, Billboard Café, Inc. signed a five-year lease with LPA for a portion of the first floor space and the entire basement at the Lucas Plaza building. Billboard Café, Inc. also granted LPA a security interest in all of its equipment and personal property. The lease restricted the use of the premises "for a bar/restaurant and for no other purposes." In addition, LPA agreed to provide Billboard Café $75,000 of "tenant finish allowance" payments, of which $60,000 was payable directly to Kujawa, as Ebeling's contractor. The remaining $15,000 equaled the value of HVAC equipment to be installed and paid for by LPA. Billboard Café, Inc. also agreed it would protect LPA from any mechanic's liens on the property.

In January 1989, Kujawa began making improvements to the space subject to the Ebeling lease. He completed the work that May. Billboard Café opened for business in July 1989. While Kujawa was working on the Lucas Plaza space, Ebeling began discussions with LPA about developing the second floor of the building for Tridon Corporation (Tridon). Ebeling was both a shareholder, officer, and director of Tridon. Tridon planned to use the second floor space for offices. LPA leased the second floor space to Tridon in April 1989

1. Kujawa's suit also named Continental Systems Management and St. Peter's Supply Company d/b/a A.J. Plumbing Co. The suit also named the individual members of the LPA general partnership: Michael F. La-Plante and Downtown Investment Company, a Missouri general partnership comprised of: John G. Wilson, Michael P. Murphy, Richard F. Jordan and Paul J. McKee, Jr. The dispositions of claims against these defendants are not appealed.

for a term of ten years. The Tridon lease provided for a $30,000 "tenant finish allowance," again payable directly to Kujawa, as contractor. Further, the lease provided that Tridon would indemnify LPA against any mechanic's lien. After the parties signed the Tridon lease, Kujawa began making, but failed to complete, improvements to the second floor space.

While Kujawa was working on the restaurant space, LPA, through CMC, made payments to Kujawa equaling $62,974, or slightly over the full amount of the "tenant finish allowance" as stated in the Billboard Café lease. Kujawa issued lien waivers to LPA totaling $69,070 for Billboard Café work completed through March 24, 1989. In addition, LPA disbursed directly to Kujawa the full amount of the "tenant finish allowance" as provided for in the Tridon lease, $30,000. Kujawa provided lien waivers to Tridon for material and labor on the Tridon space completed through May 23, 1989 for $44,145. Thus, LPA, either directly or indirectly through CMC, fully paid all amounts for the tenant improvements pursuant to its Billboard Café and Tridon lease agreements. The Billboard Café restaurant opened in July 1989. It closed approximately six months later.

On January 9, 1990, Kujawa filed a mechanic's lien for $162,922.69. On June 18, 1990, Kujawa brought this suit against, among others, LPA, CMC, Paric, Billboard Café, Inc. and Tridon. On Count I, he sought to enforce his mechanic's lien, and in Count II, he alleged a cause of action in quantum meruit. On June 22, 1990, in a separate proceeding, LPA sued Billboard Café, Inc. for rent and possession, seeking $222,000 in accelerated unpaid rent, possession of the property, and other relief. In October 1990, LPA and Billboard Café, Inc. settled the case with a written agreement whereby LPA took title to specified restaurant equipment. LPA also sued Tridon for rent and damages. LPA alleged Tridon never paid any rent to LPA, nor its share of the utilities and, as of the Decem-

ber 1992 transfer of the Lucas Plaza Building, Tridon owed $117,333 in unpaid rent.

In December 1990, Defendants filed a suggestion of a pending involuntary bankruptcy proceeding brought against Kujawa. On April 10, 1992, LPA consolidated its suit against Tridon into Kujawa's suit. On July 9, 1992, the trial court issued an order staying the proceedings because of the bankruptcy proceeding ultimately dismissed in 1997. LPA alleged in its motion for summary judgment that in December 1992, it sold the Lucas Plaza Building for less than it paid for it. An unopposed affidavit affirmed it sold the building at a loss. It remained liable after the sale to Mark Twain Bank for $90,000 on a purchase money note and to CMC for $15,000 for its services.

On May 18, 1998, LPA, CMC, Paric, Mark Twain, and Tarquad moved for summary judgment on both counts of Kujawa's petition. The court found Billboard Café, Inc. and Tridon in default. LPA also moved for summary judgment against Tridon on its consolidated claim. On June 22, 1998, Kujawa voluntarily dismissed, without prejudice, his mechanic's lien claim. He continued to defend his quantum meruit claims against all defendants. On November 16, 1998, the trial court granted the defendants' motions for summary judgment. On February 4, 1999, the trial court granted LPA's motion for summary judgment against Tridon for unpaid rent and damages. On February 11, 1999, it granted Kujawa a default judgment against defendants Tridon and Billboard Café, Inc. for $213,979.20. Kujawa appeals summary judgments against him.

In Kujawa's sole point of error, he argues the trial court erred in granting defendants' motions for summary judgment in that a genuine issue of material fact exists as to whether the defendant's retention of the benefits of his services without full compensation is inequitable. We find no genuine issue in dispute.

Our standard of review of a trial court's granting of summary judgment is well set-

tled. Summary judgment will be upheld on appeal if no genuine issue of material fact exits and the movant is entitled to judgment as a matter of law. *Lawrence v. Bainbridge Apartments,* 919 S.W.2d 566, 569 (Mo.App. W.D.1996). Our review on such appeals is essentially *de novo.* *I.T.T. Commercial Finance Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). "The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment." *Id.* When considering appeals from summary judgments, we review the record in the light most favorable to the party against whom the judgment was entered. *Id.* However, we will accord the non-movant the benefit of all reasonable inference from the record. *Id.*

A defending party may establish a right to judgment as a matter of law by showing facts that negate any one of the elements of the claimant's cause of action. *Id.* at 581. Once the movant has met the burdens establishing a right to judgment as a matter of law, the non-movant must show one or more of the material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed. *Id.* In the end, where the record reasonably supports any inference other than those necessary to support judgment for the movant, a genuine issue of material fact exists. *J.M. v. Shell Oil Co.,* 922 S.W.2d 759, 761 (Mo. banc 1996).

A quantum meruit claim is based on a promise implied by the law that a person will pay reasonable compensation for valuable services or materials provided at his request or with his approval. *Kickham v. Gardocki,* 966 S.W.2d 361, 363 (Mo.App. E.D.1998). This type of implied contract is in fact a noncontractual obligation that is treated procedurally as if it was a contract, but that has as its principal function the prevention of unjust enrichment. *Westerhold v. Mullenix Corp.,* 777 S.W.2d 257, 263 (Mo.App. E.D.1989). A claim for quantum meruit, under a theory of implied contract, does not require the existence of an express agreement between the parties at issue. *Incentive Realty, Inc. v. Hawatmeh,* 983 S.W.2d 156, 163 (Mo.App. E.D.1998).

In cases of quantum meruit recovery, the defendant, viewed as breaching the implied contract, is required to return to the injured party the reasonable value of work and labor furnished. *Iota Management Corp. v. Boulevard Investment Co.,* 731 S.W.2d 399, 417 (Mo.App. E.D. 1987). The law will imply a promise to pay reasonable value if plaintiff supports the claim with evidence the services were requested and actually received with an expectation of compensation. *In re Estate of Bush,* 908 S.W.2d 809, 811 (Mo.App. E.D.1995). As we said in *Erslon v. Vee–Jay Cement Contracting Co., Inc.,* 728 S.W.2d 711, 713 (Mo.App. E.D.1987):

> The principle of unjust enrichment has given rise to the doctrine of quasi-contract, also known as a contract implied in law, as a theory of recovery. Courts generally recognize that the essential elements of quasi-contract are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; and (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable.

In *Erslon,* we concluded the "most significant requirement is that the enrichment to the defendant be unjust; that retention of the benefit be inequitable." *Id.*

We have held that unjust benefits are those conferred (a) as a result of a mistake of fact as to a right or duty, or (b) through a dutiful intervention in another's affairs, or (c) under restraint. *Rolla Lumber Co. v. Evans,* 482 S.W.2d 519, 522 (Mo.App. 1972). In *Rolla,* we held that for an implied promise to be found, the person benefited must do something from which his promise to pay may be fairly inferred. *Id.*

Applying these principles, we find there are no summary judgment facts

to support a finding that a genuine issue of material fact exists as to whether the defendant's retention of the value of Kujawa's works without full compensation is inequitable. Ordinarily, when improvements are made to leased premises at the request of the tenant, "the person furnishing labor or materials for this work is only entitled to impose liability for the labor or materials against the leasehold interest and not against the landlord's interest in the premises." 46 A.L.R. 5th 1 (1997). As an exception to the general rule, courts have found some acts or omissions of the landlord-owner may be the basis for a finding the landlord-owner liable on a quantum meruit theory for the value of the improvements done at the request of a tenant. The facts do not support applying the exception in this case.

When Kujawa did the work to improve the Lucas Plaza building, he was a vice-president of Billboard Café, Inc. and director of Tridon. In addition to facts known by him in his representative capacities, he understood part of his agreement with Ebeling was that he would have an ownership interest in Billboard Café, Inc. as part of his compensation for his remodeling work. These positions, along with his dealings with LPA and CPC, support a finding he knew the terms of LPA's lease agreements with Billboard Café, Inc. and Tridon, particularly of the "tenant finish allowance" limitations found in the leases.

Thus, Kujawa knew LPA's liability for the improvements was limited to the "tenant finish allowances." On May 23, 1989, he signed a lien waiver for CMC's payment for $6,794 for the Tridon work as a "final draw." The next day, CMC issued a check to Kujawa, and noted on the check "final payment for tenant finish at Lucas Plaza." Kujawa exchanged letters with Ebeling as well as his subcontractors, which contained statements that support a finding that he knew Ebeling's companies were liable for the contracting work, and not the defendants. In one letter, Kujawa said he was paid the "tenant finish" amount and that Ebeling was "to raise an additional $70,000 to complete the project. [Ebeling] failed to do so. Therefore, Billboard Café owes the money. Pay it." In another letter, he told Ebeling to "pay [his] bills." In a third letter, he accuses Ebeling of refusing "to make payments due [him] and others" and tells him, again to pay the money he owes him. Further, Kujawa testified in his involuntary bankruptcy proceedings that his understanding was that "any additional monies, over and above the 'tenant finish allowance' payments, would be raised by Ebeling and [himself], towards the construction of the project." Kujawa also testified by affidavit that when it became apparent to him he was not a partner in Billboard Café, he "sought payment [from defendants] of the reasonable value of the services, labor, material, equipment and furnishings" which he provided. There is no evidence to support a finding that Kujawa had any expectation of payment from defendants beyond the "tenant finish allowance" provisions under the leases before he did the works or during performance. Retention of the improvements by LPA, under these circumstances, is neither unjust nor inequitable.

In addition, there is no evidence to support a finding that an implied contract should be found based on any of the defendants' actions. The leases provided LPA with the right to review and approve the floor works and observed the work-in-progress. However, none of the defendants actively supervised or altered the plans or participated in construction activity for the tenants. The general rule, not the exception, applies on the undisputed facts. For this reason appellant's motion to strike parts of respondent's supplemental legal file is denied.

We affirm.

WILLIAM H. CRANDALL, Jr., P.J. and MARY K. HOFF, J., concur.