CENTRAL PARKING SYSTEM OF
MISSOURI, LLC, Respondent,

v.

TUCKER PARKING HOLDINGS, LLC
and Tucker Parking Equities,
LLC, Appellants.

No. ED 104361

Missouri Court of Appeals,
Eastern District,
**DIVISION FIVE.**

Filed: April 18, 2017

Mark E. Goodman, Amy L. Fehr, Capes, Sokol, Goodman & Sarachan, P.C., Clayton, MO, for Appellants.

Jan P. Miller, Booker T. Shaw, Brian A. Lamping, Thompson Coburn, St. Louis, MO, for Respondent.

Philip M. Hess, Chief Judge

## Introduction

Tucker Parking Holdings, LLC and Tucker Parking Equities, LLC (collectively "Tucker") appeals from the judgment of the Circuit Court of the City of St. Louis in favor of Central Parking System of Missouri, LLC ("Central"). This case arises out of a dispute between the parties over who is responsible for the expenses relating to the near-collapse of a parking garage owned by Tucker and operated and leased by Central. The trial court determined that Tucker was responsible for the expenses, and granted Central damages in the amount of $4,161,424.76 for costs Central paid to evacuate and stabilize the parking garage. We affirm.

## Factual Background [1]

The evidence, viewed in the light most favorable to the trial court's judgment, is as follows.[2]

In 1998, Central[3] leased a multilevel parking garage located at 306–310 North Tucker Blvd., St. Louis, Missouri (the "Garage") from 310 North Tucker, LLC ("Predecessor"). The Garage was built in 1967, and was constructed using cast-in-place concrete slabs supported by a button-head post-tensioning ("PT") system. The button-head PT system design was commonly used during the time of the Garage's construction, but has since become obsolete.

---

1. We note that both parties' statements of facts are argumentative and omit key facts in violation of Rule 84.04(c).

2. *See Brizendine v. Conrad,* 71 S.W.3d 587, 590 (Mo. 2002).

3. Specifically, Central's predecessor. Central Parking System of St. Louis. Inc.

Central entered into a Restated Lease with Predecessor in April 2000 (the "Lease"). The Lease provided that Central was solely responsible for maintenance and structural repairs to the Garage, but contained an exception for repairs necessitated by normal wear and tear. Specifically, Section 8(a) of the Lease stated that:

Tenant shall, throughout the term of this lease, maintain the Premises (and all structural components thereof)... in good order, condition and repair, and Tenant shall not commit or suffer any waste with respect thereto. Except as specifically set forth in this lease, Tenant shall promptly make all repairs, interior and exterior, structural and nonstructural, ordinary as well as extraordinary, foreseen as well as unforeseen, necessary to keep the Premises in good and lawful order and condition (*normal wear and tear* and damage from fire or other casualty *excepted*) .... (Emphasis added).

In addition, Section 15(a), governing the expiration of the Lease, also included a wear and tear exception, requiring Central to surrender the Garage to Predecessor at the termination or expiration of the Lease "broom clean, in good order and condition, ordinary wear and tear and damage from casualty and fire excepted ...." The Lease also included an "as is" clause in Section 30, stating that:

[Central] has examined [the Garage] and is fully familiar with the physical condition thereof, and [Central] accepts the same "AS IS" on the Commencement Date. Except as expressly set forth to the contrary in this lease, [Central] assumes all risks, if any, resulting from any latent or patent defects in [the Garage] .... [Predecessor] made no representation or warranties in respect of the physical condition [of the Garage] ....

In 2007, Tucker purchased the Garage from Predecessor for $4,125,000. Tucker did not inspect the condition of the Garage's PT system when it purchased the Garage.

In March 2013, Tucker hired an engineering firm, Carl Walker, Inc. ("Carl Walker") to provide an appraisal of the Garage in order to determine repairs Central might be required to make prior to the Lease's expiration on March 31, 2015. In its report, Carl Walker determined that the Garage's concrete slabs showed signs of "widespread deterioration resulting from corrosion of the embedded reinforcing steel" and that there was approximately 21,500 square feet of delaminated concrete in the Garage. Carl Walker advised that additional testing was necessary to determine the condition of the PT system, and it recommended a budget of $2,470,000 for concrete repairs, exclusive of any repairs to the PT system that might be required. Tucker provided Central with a copy of the Carl Walker report shortly thereafter.

At approximately the same time, Central hired its own engineering firm, Walker Restoration Consultants ("Walker Restoration") to investigate the condition of the Garage's PT system. Walker Restoration's principal, Dan Moser, performed excavations at the Garage in order to visually inspect the PT system. Mr. Moser produced a report ("Moser 2013 Report") which estimated that 55% of the Garage's joist PT tendons were either broken or under partial tension. The Moser 2013 Report estimated a budget of $2,276,000 was necessary to repair the PT system. This put the combined estimate of repairs at approximately $4,800,000. Central did not disclose the full Moser 2013 Report to Tucker, despite Tucker's repeated requests.

In June 2013, Central offered to pay Tucker $1,483,500 in exchange for a release from its obligations under the Lease to repair the Garage. Tucker rejected this offer, as well as Central's later offer in 2014 to enter into a new five year lease that would shift the obligations of structural maintenance and repair onto Tucker.

In March 2014, Central selected Tarlton Corporation ("Tarlton") to perform repairs on the Garage, including PT system repairs, at a bid price of $2,892,000. On July 3, 2014, while in the beginning stages of repairing the Garage, Tarlton notified Walker Restoration that some of the PT floor joists that supported the Garage had cracks. Tarlton also informed Walker Restoration that it heard a series of small pops or explosions that it believed indicated that the joist PT systems were fracturing. Upon this information, Walker Restoration determined that the joists were at risk of collapsing and had to be repaired, which required the Garage to be closed to car traffic. A few days later, additional cracking in the joists was observed and, on Walker Restoration's recommendation, Central completely evacuated [4] the Garage and closed it off from the public. Over the following weeks, Tarlton, at Central's request, began installing a shoring system in the Garage that was composed of thousands of wood and metal support columns. The shoring system prevented the Garage from collapsing and provided structural support for Tarlton to make repairs to the PT system. Central notified Tucker of the emergency and kept Tucker informed of its plan to stabilize and repair the Garage.

In September 2014, Walker Restoration recommended to Central that the damage to the PT system was so extensive that a steel beam support system was required to be installed throughout the Garage. Walker Restoration estimated that installing such a system could cost $16,080,000 or more. On September 5, 2014, Central represented to Tucker that it would be moving forward with the steel beam repair plan.

In December 2014, both Tucker's engineers and Central's engineers conducted destructive testing at the Garage to investigate the PT system and determine the cause of its failure.[5] Following the tests, Central expressed to Tucker that it did not think it was responsible for the PT system repairs under the Lease because its engineers had concluded that the cause of the PT failure was due to ordinary wear and tear.

On March 9, 2015, Central and Tucker both filed suit against each other. In its petition, Central sought a declaration that it was not responsible under the Lease for the PT system repairs. Central also filed claims against Tucker for breach of lease, and "unjust enrichment/quantum meruit." Tucker, in its petition, sought a declaration that Central was responsible for the PT system repairs, and filed claims against Central for breach of lease, waste, and negligence. The trial court later consolidated the actions.

On March 25, 2015, Tucker filed a motion for a temporary restraining order and preliminary injunction. In its motion, Tucker argued that the costs of the shoring system constituted "structural repairs" that fell within Central's obligations under the Lease. Accordingly, Tucker argued, Central was responsible for continuing to maintain the shoring system and pay the

---

**4.** As part of the evacuation, Central spent thousands of dollars accommodating Tucker's commercial tenants that had been leasing space on the bottom floor of the Garage.

**5.** The engineers also conducted a follow-up investigation in April 2015, following the commencement of the present litigation.

ongoing expenses associated with it. The following day, the trial court heard oral argument on Tucker's motion and granted it in part, enjoining Central and Tarlton from removing or altering the shoring system. The trial court did not rule on which party was responsible for paying the costs of the shoring system.

On March 31, 2015, the Lease term ended and Central vacated the Garage. However, the shoring system was kept in place and monitored by Tarlton.

The parties agreed to bifurcate the case. In the first phase, the parties agreed to present evidence on Tucker's motion for preliminary injunction in order to determine both the cause of the PT system failure and which party was responsible for the expenses arising from the failure. In the second phase, the trial court was to conduct a damages hearing to determine the damages to be awarded to the party that prevailed in the first phase.

On July 28, 2015, as part of the first phase, the trial court held an evidentiary hearing on Tucker's motion for preliminary injunction. Following the hearing, the trial court issued its judgment on October 13, 2015, in which it determined that Tucker was responsible for the costs and expenses associated with the PT system failure because the failure occurred due to normal wear and tear. A summary of the trial court's findings of fact and conclusions of law is provided below:

- The PT system failure constituted normal deterioration for a concrete parking structure built in 1967 using a button-head PT system.
- The button-head PT system construction joints were vulnerable to water penetration. Chloride-laden water, brought into the Garage over the years by vehicles entering the Garage, had slowly degraded the PT

tendons, ultimately causing the PT system to fail in July 2014.

- The Garage, at the time of the PT system failure, had survived well-beyond its design life.
- The PT system did not fail due to neglect by Central in repairing cracked delaminations over the stressing pockets in a timely matter. Tucker did not know when the delaminations appeared, and did not prove that Central failed to repair the delaminations in a timely matter.
- The PT system failed at multiple locations where the top side concrete "was pristine," which demonstrated that neglected or cracked concrete was not the cause of the PT system failure.
- The PT system is beyond repair, and Section 8(a) of the Lease did not contemplate a replacement or a rebuild of the Garage.
- Central did not "waive" its rights under the Lease by agreeing to fix the PT system before it knew the extent and cause of the PT system's damage.

On January 21, following the evidentiary hearing for the second phase of the trial, the trial court issued its judgment regarding the amount of damages Tucker owed Central. A summary of the trial court's findings of fact and conclusions of law is provided below:

- Central notified Tucker immediately when it became aware of the cracking in the Garage's joists in July 2014, and informed Tucker of its plan to repair the Garage. Central gave Tucker detailed updates on the work, and Tucker was fully aware of the magnitude of the work being done, and the significant costs associated with it.

- Absent the efforts of Central, the Garage would have collapsed, and the shoring system installed by Central was necessary to avoid a catastrophic event.
- Central satisfied "all the elements of its claim for unjust enrichment/quantum meruit." 1) Central provided a valuable benefit to Tucker by preventing the Garage's collapse and assisting Tucker's retail tenants after the Garage was evacuated; 2) the benefit came at Central's expense; and 3) it would be inequitable for Tucker to retain the benefit without compensating Central because Tucker "acquiesced" to Central's response to the PT system failure, Tucker was aware that Central would reevaluate its rights under the Lease in response to the emergency, Central was responding to an emergency situation, and Central did not know the cause and extent of the damage to the PT system at the time it agreed to pay for the shoring costs.
- Central was entitled to $4,161,-424.76 [6] in damages from Tucker on its claim of unjust enrichment/quantum meruit.

This appeal follows.

## Discussion

Tucker argues three points of error on appeal. Tucker asserts that the trial court

erred when it: 1) held that the Garage's PT system failed due to "normal wear and tear," because a defect in the Garage's construction was the proximate cause of the damage; 2) rejected Tucker's estoppel argument, because it focused on Central's lack of knowledge, and "knowledge of the facts" is not an element of estoppel; and 3) awarded damages to Central on its claim for unjust enrichment/quantum meruit because Central failed to establish that a mutual expectation existed between the parties that Tucker would pay Central for the costs associated with the shoring system.

## Point I

### *Standard of Review*

■ In its opening brief, Tucker fails to provide a standard of review for any of its points on appeal. Nevertheless, this Court's standard of review in court-tried cases is governed by *Murphy v. Carron.* 536 S.W.2d 30 (Mo. banc 1976). Under *Murphy v. Carron,* this Court will affirm the judgment of the trial court "unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law." *Lambrich v. Kay,* 507 S.W.3d 66, 74 (Mo. App. E.D. 2016).[7] We accept the evidence and reasonable inferences therefrom which support the trial court's decision as true, and we disregard all contrary evidence and inferences.

6. The trial court calculated the damages by considering the $37,109.74 billed by Walker Restoration, $3,894,631.00 billed by Tarlton for the shoring system, $167,160.75 relating to the costs associated with evacuating the tenants from the Garage, and $37,109.76 paid to Securitas for around-the-clock security at the Garage.

7. Tucker fails, in each of its points relied on, to specify the type of *Murphy* claim it is asserting on appeal. *See Smith v. Great Am. Assur. Co.,* 436 S.W.3d 700, 703 (Mo. App.

S.D. 2014). "[E]ach *Murphy* ground is a separate, distinct legal claim," and each requires different analyses. *Id.* Although Tucker argues that the trial court erroneously applied the law in its arguments following Point II and III, the *Murphy* ground should have been included "within the point itself." *Id.* (citing Rule 84.04(d)(1)(A) & (B)) ("[P]oints *shall* identify the challenged actions and 'the legal reasons for the appellant's claim of reversible error ....'"). We exercise our discretion to review Tucker's points. *See Id.*

*McAllister v. McAllister*, 101 S.W.3d 287, 290 (Mo. App. E.D. 2003). If the trial court did not make a finding on a specific issue of fact, we will consider it "as having been found in accordance with the result reached." *Id.* We defer to the trial court's judgment on contested issues of fact, but we review issues of law *de novo*. *Kristen Nicole Properties v. Shafinia*, 500 S.W.3d 902, 905 (Mo. App. W.D. 2016). Ultimately, in an appeal from a court-tried case, this Court is primarily concerned with "the correctness of the result, not the route taken to reach it. Accordingly, if a trial court's ruling is correct, it will not be disturbed on appeal because the court may have given a wrong or insufficient reason for it." *In re Marriage of Ulmanis*, 23 S.W.3d 814, 819 (Mo. App. S.D. 2000).

■ Central claims Tucker's first point includes arguments that were not raised before the trial court and therefore are not reviewable by this Court under *Murphy v. Carron*. Specifically, Central asserts that Tucker did not argue before the trial court that a "defect" in the Garage's construction joints was the proximate cause of the Garage's PT system failure. Central points out that Tucker did not raise the argument in their post-trial brief, and never asked the trial court to apply a proximate cause approach in their proposed findings of fact and conclusions of law. In its reply brief, Tucker argues that three of the claims in its petition–negligence, waste, and breach of contract–all included proof of proximately caused damages as an element, and therefore the issue of proximate cause was necessarily before the court.

We agree with Central that Tucker's argument in Point I was not raised before the trial court and is not preserved for

appeal. As Central points out, neither party argued at trial that the Garage's construction joints were "defects." Tucker's argument at trial was that the PT system failed due to Central's failure to properly maintain the Garage-not "defective" construction joints. From the record, it appears that Tucker's argument at trial was the opposite of what it is arguing now on appeal. At trial, Tucker's expert testified that the "fundamental disagreement" between Tucker's and Central's experts was that:

> "[Central's experts] are saying that the PT failure is the result of water going directly into that joint and causing the corrosion of those strands. And what we're saying is that the delaminations [caused due to Central's negligence] *had to happen first to make that—because those joints were very tight*, that the *corrosion had to happen first before the water could leak into those joints* and cause that failure." (Emphasis added).

Because the issue of whether the construction joints constituted design or construction defects was not put before the trial court, we cannot convict the trial court of error for failing to consider the issue. *See Barner v. The Missouri Gaming Co.*, 48 S.W.3d 46, 50 (Mo. App. W.D. 2001) ("An appellate court will not review or convict a trial court of error on an issue that was not put before the trial court to decide.").[8]

■ Tucker did not ask for plain error review in the event this Court held that their first point was not preserved for appeal. We note that Rule 84.13(c) provides that "[p]lain errors affecting substantial rights may be considered on appeal, in

---

8. We note that, effective July 1, 2017, Missouri Supreme Court Rule 78.07(b) will reflect this longstanding rule, and will state that "[i]n cases tried without a jury ..., neither a

motion to amend the judgment or opinion is necessary to preserve any matter for appellate review *if the matter was previously presented to the trial court.*" (Emphasis added).

the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." However, an appellate court will rarely find plain error in a civil case. *Mansfield v. Horner*, 443 S.W.3d 627, 639 (Mo. App. W.D. 2014).

### Analysis

■ Even if Point I was preserved for appeal under *Murphy v. Carron*, or reviewed for plain error, it would not succeed. Tucker asserts that the trial court erred by not conducting a "proximate cause analysis" to determine which party was liable under the Lease for the PT system failure.[9] Tucker argues that such an analysis is required when a court finds that damage was caused by multiple factors. Tucker contends that the trial court identified two causes for the PT system failure in its judgment: 1) the vulnerability of the stressing pockets due to the presence of construction joints, which Tucker now claims was a "defect," and 2) the ingress of moisture and chlorides into the PT system. Tucker argues that under a proximate cause analysis, the trial court would have found that Central was liable for the repairs because the proximate cause of the PT system's failure was the defective construction joints, and damage from defects was not covered under the Lease's wear and tear exception.

Central contends that Tucker's proximate cause argument fails because the trial court did not find that the construction joints were defects. Central points out that although the trial court recognized the construction joints' vulnerabilities, the trial court did not classify the vulnerabilities as

defective for a button-head PT system built in the 1960's.

We agree with Central. The trial court did not make the finding that Tucker claims it made; it never found that the construction joints were defectively designed or constructed. Nowhere in its judgment did the trial court identify construction or design defects in the PT system or Garage in general. The trial court found that the PT's system's failure was the result of "usual and normal deterioration for a concrete parking structure built in 1967 using the button-head [PT] system," and that button-head PT systems were known "in the industry" to be vulnerable to water penetration.

Tucker quotes a portion of the trial court's findings which read that [10] "the primary cause of the PT deterioration is the presence of construction joints at the stressing pockets that have allowed direct ingress of moisture and chlorides to inadequately protected Tendons." Tucker argues that this quoted language proves the trial court identified multiple causes. However, in that portion of the judgment, the trial court was summarizing and comparing the different experts' testimonies, rather than making an actual finding of fact regarding causation. For example, one paragraph after the above-quoted language, the trial court stated that "Tucker's expert witness ... argues that the primary cause of the PT failure is the infiltration of water and chlorides through cracked delaminations ...." The trial court's actual finding regarding the cause of the PT system failure was that "[i]t is undisputed that corrosion-the normal process of chloride reacting with metal over

---

**9.** Tucker does not identify which type of *Murphy* claim it is making in Point I. Given the arguments it makes, we assume Tucker is asserting that the trial court erroneously applied the law.

**10.** Tucker leaves out the beginning of the quoted sentence, which is "Central Parking's expert witness testified that ...."

time-caused the failure of the Garage . . . ."

Accordingly, the trial court did not erroneously apply the law when it did not conduct the "proximate cause analysis" suggested by Tucker. The trial court never identified the PT system construction joints as design or construction defects, and Tucker is not arguing that the trial court's findings are against the weight of the evidence. Under the trial court's findings, a construction or design defect could not be the proximate cause of the PT system's failure. The trial court determined that the PT system failed due to "the inexorable effects of normal wear and tear over time," and therefore the shoring system expenses were not Central's responsibility under the terms of the Lease. Tucker's Point I is denied.

## Point II

### *Standard of Review*

As already discussed, Tucker did not provide the standard of review for any of its points. Central acknowledges that Point II was preserved by Tucker for appeal, and therefore is governed by the standard set forth in *Murphy v. Carron.*

### *Analysis*

■ In its second point on appeal, Tucker asserts that the trial court erroneously declared the law when it rejected Tucker's estoppel[11] argument on the basis

that Central did not know the extent and cause of the PT system failure at the time it agreed to make repairs to the PT system. Tucker argues that the party to be estopped's (in this case, Central's) "knowledge of the facts" is not an element of estoppel, and therefore the trial court erred when it considered Central's lack of knowledge of the extent and cause of the PT system failure. Central asserts that Tucker misunderstands the doctrine of estoppel, and contends that estoppel does not apply unless the party to be estopped has "knowledge of the facts."

Tucker's argument is centered on its interpretation of the Missouri Supreme Court case *Brown v. State Farm Mut. Auto. Ins. Co.*, 776 S.W.2d 384 (Mo. banc 1989). In that case, the Court sought to clarify and distinguish the doctrines of waiver and estoppel. The Court noted that "[c]lassically, estoppel requires '(1) an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement or act.' " *Id.* at 386 (quoting *Mississippi–Fox Drainage Dist. v. Plenge*, 735 S.W.2d 748, 754 (Mo. App. E.D. 1987)). The Court explained that waiver applies to situations where a party has knowingly and intentionally relinquished a known right.[12] *Id.* at

11. Although neither party explicitly states it, given the context and the cases cited, it is clear that Tucker's estoppel claim is based on a theory of equitable estoppel, as opposed to promissory estoppel.

12. Tucker argues that the trial court conflated waiver and estoppel in its judgment, and we agree that the trial court may have done so when it stated that "[u]nder Missouri law, the doctrine of waiver and estoppel apply only to *known* rights." However, courts have held that equitable estoppel may arise "from the

unfairness of allowing a party to belatedly assert *known rights* on which the other has, in good faith, relied thereby and become disadvantaged. *Ditto, Inc. v. Davids*, 457 S.W.3d 1, 17 (Mo. App. W.D. 2014) (quoting *Shores v. Express Lending Servs., Inc*, 998 S.W.2d 122, 127 (Mo App. E.D. 1999) (emphasis added). More importantly, "if a trial court's ruling is correct, it will not be disturbed on appeal because the court may have given a wrong or insufficient reason for it." *Ulmanis*, 23 S.W.3d at 819.

386–87. However, the *Brown* Court did not address the role "knowledge of the facts" plays in an estoppel analysis.

■■■■ Tucker argues that because the Court in *Brown* did not mention "knowledge of the facts" when it discussed the elements of estoppel, the trial court erroneously declared the law by considering Central's knowledge, or lack thereof, of the PT system's condition. Tucker is correct that *Brown* listed what Missouri courts have identified as the three essential elements of estoppel,[13] and a party who asserts equitable estoppel must establish each of those three elements by clear and satisfactory evidence. *Shores v. Express Lending Services, Inc.*, 998 S.W.2d 122, 127 (Mo. App. E.D. 1999). However, we disagree with Tucker that a party's "knowledge of the facts" cannot be considered by a court when evaluating the appropriateness of granting equitable estoppel. Courts analyze the elements of estoppel within the context of the surrounding case. *See id.* "[A]n equitable estoppel rests upon the facts and circumstances" of each individual case, and is "considered in the framework of the elements, requisites, and grounds of equitable estoppel." *Peerless Supply Co. v. Indus. Plumbing & Heating Co.*, 460 S.W.2d 651, 666 (Mo. 1970).

■■■■ Consequently, because estoppel rests on the unique facts and circumstances of each case, "any attempted definition [of estoppel] usually amounts to no more than a declaration of an estoppel under those facts and circumstances." *Am.*

*Nat. Ins. Co. v. Noble Commun. Co., Inc.*, 936 S.W.2d 124, 134 (Mo. App. S.D. 1996). However, it is clear that relief by estoppel is not favored by courts, and "will not be applied lightly." *Back Ventures, L.L.C. Series D v. Safeway, Inc.*, 410 S.W.3d 245, 255 (Mo. App. W.D. 2013) (citing *Farmland Indus., Inc. v. Bittner*, 920 S.W.2d 581, 583 (Mo. App. W.D. 1996)). Moreover, an estoppel "will not arise unless justice to the rights of others demands it." *Shores v. Express Lending Services, Inc.*, 998 S.W.2d 122, 127 (Mo. App. E.D. 1999) (citing *Peerless*, 460 S.W.2d at 666).

■■■ Missouri courts have consistently considered both parties' knowledge of the material facts when analyzing whether granting an estoppel is proper. This Court, in a case decided post-*Brown*,[14] held that "[o]ne cannot set up another's act or conduct as the ground of an estoppel when he knew or had the same means of knowledge as the other to the truth." *Channawood Holdings, LLC v. 1209 Washington, LLC*, 333 S.W.3d 480, 488 (Mo. App. E.D. 2010). "[I]f both parties know the facts or have equal means of ascertaining them there can be no estoppel." *Id.* (citing *Rhoads v. Rhoads*, 342 Mo. 934, 119 S.W.2d 247, 252 (Mo. 1938)).

In *Littlefield v. Edmonds*, the Southern District held that, to support a claim of estoppel, "the petitioning party must show *these [material] facts were known to the party estopped, and unknown to the other party.*" 172 S.W.3d 903, 908 (Mo. App. S.D. 2005) (citing *Bass v. Rounds*, 811 S.W.2d

13. *See, e.g., JGJ Properties, LLC v. City of Ellisville*, 303 S.W.3d 642, 650–51 (Mo. App. E.D. 2010); *Jerry Anderson & Associates, Inc. v. Gaylan Industries, Inc.*, 805 S.W.2d 733, 736 (Mo. App. W.D. 1991).

14. We note that the Supreme Court in *Brown* did not discuss what role "knowledge of the facts" played in an estoppel analysis, as the Court was primarily concerned with clarify-

ing the different roles prejudice plays in an estoppel analysis as opposed to a waiver analysis. *See Brown*, 776 S.W.2d at 386 (Mo. 1989) ("We granted transfer in this case to consider whether an insured must show prejudice before the insurer may be precluded from asserting a subsequently offered, more specific defense").

775, 779 (Mo. App. E.D. 1991)) (emphasis added). The Southern District also held that "relief will be barred if the party asserting estoppel had within its reach the means of ascertaining the true state of facts and neglects to utilize those opportunities for information." *Id.* (citing *Cozart v. Mazda Distributors, Inc.*, 861 S.W.2d 347, 352–53 (Mo. App. S.D. 1993)).

Furthermore, in *Farmland Industries, Inc. v. Bittner*, the Western District held that estoppel will not be granted where the party seeking an estoppel had "the same means of knowledge as the other to the truth." 920 S.W.2d 581, 583 (Mo. App. W.D. 1996). The court further held that there can be no estoppel where "acquiescence by all concerned is due to a common mistake." *Id.*

 Finally, in *Peerless Supply Company v. Industrial Plumbing & Heating Company*, the Supreme Court held that a party "relying on an estoppel must have exercised such reasonable diligence to acquire knowledge of the real facts as the circumstances of the case require." 460 S.W.2d at 667. The Court further held that "Where an owner has knowledge of facts that would put a reasonably prudent person up on inquiry," then the fact-finder may "infer that he had knowledge of all facts which such an inquiry would have developed." *Id.* If such an owner "conducts himself with a careless indifference to means of information reasonably at hand or ignores highly suspicious circumstances which should warn him of danger or loss he cannot invoke the doctrine of estoppel." *Id.*

In the present case, Tucker does not challenge the trial court's findings that Central lacked knowledge of the cause and severity of the PT system damage when it hired contractors to repair the Garage in June 2014. Tucker does not challenge the trial court's finding that it was not until December 2014, when engineers from both parties conducted destructive testing at the Garage, that Central learned the PT system had failed due to wear and tear. Accordingly, it is undisputed that the material facts of this case were not "known to the party estopped, and unknown to the other party." *Littlefield*, 172 S.W.3d at 908. Tucker also does not dispute that it had a right to inspect the Garage under the Lease, and therefore had an equal means of knowledge to ascertain the true state of the PT system if it so desired. Therefore, Tucker cannot set up Central's acts as grounds for an estoppel; and the trial court did not erroneously apply the law when it rejected Tucker's estoppel argument. *See Channawood*, 333 S.W.3d at 488. Point II is denied.

## Point III

### *Standard of Review*

Central acknowledges that Point III was preserved by Tucker for appeal, and therefore is governed by the standard set forth in *Murphy v. Carron.*

### *Analysis*

 In its third point, Tucker argues that the trial court erred when it awarded damages to Central on its claim of "unjust enrichment/quantum meruit." [15] Tucker argues that Central failed to establish a

---

**15.** Although Tucker does not address in its Point which *Murphy* claim it is making, in the body of its argument it asserts that the trial court "erroneously applied the law." Therefore, we will review Point III as an "erroneous application of the law" claim as opposed to an "against the weight of the evidence" claim. We also note that the trial court, in its conclusions of law regarding Central's "unjust enrichment/quantum meruit" claim, used headings that did not track the elements of quantum meruit. However, the trial court made sufficient findings to support a claim of quantum meruit, and the parties briefed the case on the issue of quantum meruit.

claim for quantum meruit, because it failed to establish that the parties had an expectation that Tucker would pay Central for the expenses related to the shoring system. Accordingly, Tucker asserts, Central could only recover damages under a theory of unjust enrichment, and under that theory Central could only recover the value the shoring system added to the Garage, which Tucker argues was valueless. Central contends that it was not required to prove a "mutual expectation of compensation" because it had already established that Tucker acquiesced to the expenses Central paid relating to the shoring system.

"Quantum meruit is a remedy to enforce quasi-contractual obligations and is generally justified on the theory of unjust enrichment." *Holliday Investments, Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 295 (Mo. App. W.D. 2015). The lines between unjust enrichment and quantum meruit are often blurred, but each is a separate cause of action. *Id.* The distinction between the two causes of action is an important one, because each has different measures of recovery and elements of proof. *See Id.* at 295–296.

The essential elements of quantum meruit are: (1) that the plaintiff provided the defendant with materials or services at the defendant's request or with the acquiescence of the defendant, (2) that the materials or services had reasonable value, and (3) that the defendant failed and refused to pay the reasonable value of such materials or services despite the demands of plaintiff. *Id.*

The essential elements of unjust enrichment are: "(1) the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; and (3) that it would be unjust to allow the defendant to retain the benefit." *Id.* at 295.

For a quasi-contract based upon quantum meruit, recovery is based upon the reasonable value of the goods or services furnished to the defendant. *Id.* at 295–96. For a quasi-contract based upon unjust enrichment, "recovery is not the actual amount of the enrichment, but the amount of the enrichment which … would be unjust for one party to retain." *Johnson Group, Inc. v. Grasso Bros., Inc.*, 939 S.W.2d 28, 30 (Mo. App. E.D. 1997).

Tucker does not challenge the reasonable value of Central's expenditures or the trial court's finding that Tucker acquiesced to the expenditures. Instead, Tucker argues that Central failed to prove an "essential component" of the first element of quantum meruit; that "the services were provided with a mutual expectation that the provider would seek compensation for the services from the recipient." In support of its argument, Tucker cites to *Danforth v. Kansas City Firefighters*, which held that one of the requirements for recovery under a theory of quantum meruit is that:

> [t]he evidence must of course disclose that the one who rendered the services did so under circumstances warranting a proper inference that he expected the recipient of the services to pay for them, and that the latter, in accepting the benefit of the services, was or should have been aware that they were being performed with that expectation.

585 S.W.2d 94, 97 (Mo. App. W.D. 1979); *See also Kujawa v. Billboard Cafe at Lucas Plaza, Inc.*, 10 S.W.3d 584, 588 (Mo. App. E.D. 2000) ("The law will imply a promise to pay reasonable value if plaintiff supports the claim with evidence the services were requested and actually received with an expectation of compensation.").

Central argues that it is not always necessary for a party claiming quantum meru-

it to establish a mutual expectation of payment. Central asserts that in cases where a plaintiff performs services through the acquiescence, rather than the request, of the defendant, courts do not require a further showing of mutual expectation of payment. In support of its argument, Central cites to multiple cases where courts have analyzed a claim for quantum meruit without explicitly discussing whether the plaintiff proved that the parties had a mutual expectation of payment. *See, e.g., Fowler v. Scott*, 164 S.W.3d 119 (discussing the defendant's "request or acquiescence" to plaintiff's services and the reasonable value of said services, without analyzing whether a "mutual expectation" of payment existed).

Central further argues that *Danforth*, and other quantum meruit cases which discuss the requirement that the parties had a mutual expectation of payment, do not provide the exclusive means of asserting a quantum meruit claim. Central argues that mutual expectation of payment can be inferred through a party's action or inaction, and directs us to the case *Rolla Lumber Co. v. Evans*, which held that:

> [F]or a promise to be implied, the person benefited must do something from which his promise to pay may be fairly inferred ... must be in a situation in which he is entirely free to elect whether he will accept the work, and the election must influence the conduct of the (other) party with reference to the work.
> 482 S.W.2d 519, 523 (Mo. App. 1972)(quotations omitted).

We agree with Central to the extent that, practically speaking, once a plaintiff has established the three essential elements of quantum meruit, in most cases, it will not be necessary for the plaintiff to additionally demonstrate the existence of a mutual expectation of payment between the parties. This is because mutual expectation of payment will often be implied in cases, such as this, where one party provides services to another party and the receiving party accepts or acquiesces to the performance of said services. The Supreme Court has held, in the context of analyzing a quantum meruit claim, that:

> absent a family relationship, where one performs valuable services for another, the benefit of which has been received and enjoyed by him, the law presumes an intention on the part of the former to charge and the latter to pay the reasonable value thereof and implies a promise on the part of the one receiving the services to pay a reasonable value for said services.

*Smith v. Sypret's Estate*, 421 S.W.2d 9, 14 (Mo. 1967); *see also Little Joe's Asphalt, Inc. v. C.W. Luebbert Const. Co., Inc.*, 74 S.W.3d 830, 833 (Mo. App. W.D. 2002).

Similarly, as stated by the Southern District in *Cotner Productions, Inc., v. Snadon*, "[w]here a person renders valuable service to another, the parties being strangers, and such service is accepted, the law will presume an implied promise to pay." 990 S.W.2d 92, 98 (Mo. App. S.D. 1999) (citing *Abresch v. Schultz*, 216 S.W.2d 134, 139 (Mo. App. 1948)). "Strangers" being the absence of a family relationship or a relationship which would lead one to believe that the service would be performed gratuitously. *Id.*

In the present case, the trial court's findings sufficiently provide for the inference that the parties did not expect Central to pay for the Garage's shoring system and evacuation costs gratuitously,[16] and that Tucker, at least, acquiesced to Cen-

---

**16.** Tucker was well aware that Central, by erecting the shoring system, was expecting

tral's expenses.[17] Accordingly, these inferences give rise to an implied promise that Tucker would pay Central for its services. *See Little Joe's Asphalt*, 74 S.W.3d at 833 (explaining that quantum meruit is based on a promise implied by the law that a person will pay the reasonable value for services provided with the person's acquiescence). Therefore, the trial court did not erroneously apply the law when it disregarded Tucker's argument that Central failed to demonstrate mutual expectation of compensation between the parties. Point III is denied.

## Conclusion

The judgment of the trial court is affirmed.

Sherri B. Sullivan, J. and

Gary M. Gaertner, Jr., J. concur.

reimbursement for repairs that were not Central's obligation under the Lease. In an email from Tucker's CFO to Tucker's Managing Member on July 4, 2014, the day after the Garage nearly collapsed, Tucker's CFO stated that "I think they are going to come back at us and say that some of this work isn't their responsibility .... You understand with all of the new safety concerns and new found structural damage that they are now going to be in the hole way more than originally thought. The scope of the work just expanded."

17. Again, Tucker does not assert that the trial court's findings regarding Tucker's acquiescence are against the weight of the evidence.